John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

ATTORNEYS FOR DEFENDANT JAMES DONDERO

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **(Chapter 11)** |
| | § | |
| Debtor-Plaintiff | § | **Adversary No. 21-03003-sgj** |
| v. | § | |
| | § | **Civil Case No. 3:21-CV-01010-E** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| Plaintiff. | § | |
| v. | § | |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| Defendant. | § | |

## APPENDIX IN SUPPORT OF LIMITED OBJECTION OF JAMES DONDERO TO REPORT AND RECOMMENDATION TO DISTRICT COURT ON THE MOTION TO WITHDRAW THE REFERENCE

Defendant James Dondero files this Appendix in Support of his Limited Objection to Report and Recommendation to District Court on the Motion to Withdraw the Reference and requests the Court take judicial notice of the documents contained herein.

| Exhibit | Document | Appendix Page(s) |
|---------|----------|------------------|
| A | Declaration of Michael P. Aigen in Support of Limited Objection of James Dondero to Report and Recommendation to District Court | App. 1-4 |
| 1 | Excerpts from the Transcript of the Delaware Bankruptcy Court Hearing on December 2, 2019, Case No. 19-12239 | App. 5-11 |
| 2 | Excerpts from the Transcript of the Bankruptcy Court Hearing on May 20, 2021, Adversary Proceeding Nos. 20-3195, 21-3003 | App. 12-18 |
| 3 | Appellants' Brief (filed by James Dondero, Highland Capital Management Fund Advisors LP, NexPoint Advisors LP, The Dugaboy Investment Trust, The Get Good Trust and NexPoint Real Estate Partners LLC, Case No. 3:21-CV-00879-K [Dkt. No. 16] | App. 19-52 |
| 4 | Excerpts from the Transcript of the Bankruptcy Court Hearing on February 19, 2020, Case No. 19-34054 | App. 53-64 |
| 5 | Excerpts from the Transcript of the Bankruptcy Court Hearing on January 8, 2021, Adversary Proceeding No. 20-3190 | App. 65-70 |
| 6 | Excerpts from the Transcript of the Bankruptcy Court Hearing on February 8, 2021, Case No. 19-34054 | App. 71-79 |
| 7 | Excerpts from the Transcript of the Bankruptcy Court Hearing on June 10, 2021, Adversary Proceeding Nos. 21-3006, 21-3007 | App. 80-86 |
| 8 | Debtor's proposed Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty, Adversary Proceeding No. 21-3003 | App. 87-108 |
| 9 | Expert Report of Professor Bruce A. McGovern | App. 109-122 |
| 10 | Expert Report of Alan M. Johnson | App. 123-149 |

Dated: July 21, 2021                        Respectfully submitted,

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

- and -

John Y. Bonds, III
State Bar I.D. No. 02589100
Clay M. Taylor
State Bar I.D. No. 24033261
Bryan C. Assink
State Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: john@bondsellis.com
Email: clay@bondsellis.com
Email: bryan.assink@bondsellis.com

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 21, 2021, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing system to the parties that are registered or otherwise entitled to receive electronic notices in this case.

*/s/ Bryan C. Assink*
Bryan C. Assink

# Exhibit A

Deborah Deitsch-Perez
State Bar No. 24036072
Michael P. Aigen
State Bar No. 24012196
STINSON LLP
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
(214) 560-2201 telephone
(214) 560-2203 facsimile

**ATTORNEYS FOR DEFENDANT JAMES DONDERO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **(Chapter 11)** |
| | § | |
| **Debtor-Plaintiff** | § | **Adversary No. 21-03003-sgj** |
| **v.** | § | |
| | § | **Civil Case No. 3:21-CV-01010-E** |
| **JAMES D. DONDERO,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Plaintiff.** | § | |
| **v.** | § | |
| | § | |
| **JAMES D. DONDERO,** | § | |
| | § | |
| **Defendant.** | § | |

## DECLARATION OF MICHAEL P. AIGEN IN SUPPORT OF LIMITED OBJECTION
## OF JAMES DONDERO TO REPORT AND RECOMMENDATION
## TO DISTRICT COURT

I, Michael P. Aigen, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as

follows:

---

1

**App. 2**

1.      I am a member of the law firm of Stinson LLP, counsel to Defendant James Dondero, and I submit this Declaration in support of the *Limited Objection of James Dondero to Report and Recommendation to District Court* being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit 1** is a true and correct copy of excerpts from the Transcript of the Delaware Bankruptcy Court Hearing on December 2, 2019.

3.      Attached as **Exhibit 2** is a true and correct copy of excerpts from the Transcript of the Bankruptcy Court Hearing on May 20, 2021.

4.      Attached as **Exhibit 3** is a true and correct copy of the Appellants' Brief (filed by James Dondero, Highland Capital Management Fund Advisors LP, NexPoint Advisors LP, The Dugaboy Investment Trust, The Get Good Trust and NexPoint Real Estate Partners LLC [Case No. 3:21-CV-00879-K, Dkt. No. 16].

5.      Attached as **Exhibit 4** is a true and correct copy of excerpts from the Transcript of the Bankruptcy Court Hearing on February 19, 2020.

6.      Attached as **Exhibit 5** is a true and correct copy of excerpts from the Transcript of the Bankruptcy Court Hearing on January 8, 2021.

7.      Attached as **Exhibit 6** is a true and correct copy of excerpts from the Transcript of the Bankruptcy Court Hearing on February 8, 2021.

8.      Attached as **Exhibit 7** is a true and correct copy of excerpts from the Transcript of the Bankruptcy Court Hearing on June 10, 2021.

9.      Attached as **Exhibit 8** is a true and correct copy of Debtor's proposed Amended Complaint.

**App. 3**

10.     Attached as **Exhibit 9** is a true and correct copy of the confidential Expert Report of Professor Bruce A. McGovern based upon his knowledge of deferred compensation and application of federal income tax to loans that may or may not be forgiven.

11.     Attached as **Exhibit 10** is a true and correct copy of the confidential Expert Report of Alan M. Johnson based upon his knowledge and experience advising asset management and other financial service firms on compensation.

Dated:  July 21, 2021.                          */s/ Michael P. Aigen*
                                                Michael P. Aigen

**App. 4**

# Exhibit 1

Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 1 of 137
Case 3:21-cv-01010-E    Document 4    Filed 07/21/21    Page 10 of 153    PageID 65

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7            Debtor.                       19-12239(CSS)

8  - - - - - - - - - - - - - - - - - - - - -x

9

10

11                United States Bankruptcy Court

12                824 North Market Street

13                Wilmington, Delaware

14

15                December 2, 2019

16                10:07 AM

17

18

19  B E F O R E:

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

1    Acis, learned all about Acis' relationship to Highland.  But

2    the real issue before Your Honor is what does that have to do

3    with this debtor, this debtor's assets and liabilities, and

4    this debtor's operations.  And as my comments will show, we

5    think that's a significantly overblown argument.

6           Your Honor, during their presentation, Counsel really

7    strayed a little bit from what the motion and the joinders sort

8    of said.  There they went through a painstaking analysis of the

9    various factors supporting venue.  I know Your Honor said that

10   over three factors, you don't find that helpful, but the courts

11   have relied on a series of factors.

12          And I think the reason why they have strayed away from

13   that and focused on the committee being the one to support the

14   transfer-of-venue motion and the facts of the Acis case is

15   because when you pare it down, the actual factors demonstrate

16   that there is no way the committee can carry its burden to

17   demonstrate that venue should be transferred.

18          However -- Your Honor pointed to this at the

19   beginning, in mentioning comments about forum-shopping -- the

20   committee and Acis are really being disingenuous, and they have

21   not told you the real reason that they want the case before

22   Judge Jernigan.

23          At the first-day hearing, Your Honor, Acis said they

24   intended to file a motion for an appointed trustee.  The

25   committee has told the debtor it intends to file a motion to

 1   appoint a trustee after this hearing.  The motion has not yet
 2   been filed, Your Honor, because they want Judge Jernigan to
 3   rule on that motion.  And it's not because she's familiar with
 4   this debtor's business, this debtor's assets, or this debtor's
 5   liabilities, because she generally is not.  It is because she
 6   formed negative views regarding certain members of the debtor's
 7   management that the committee and Acis hope will carry over to
 8   this case.
 9          The convenience of the parties and the interests of
10   justice and how this case is so unique are just a pretext.
11   They want a trustee to run the debtor, and they want Judge
12   Jernigan and not Your Honor to rule on that motion.  That, Your
13   Honor, is not a proper reason to transfer venue, but rather a
14   transparent litigation ploy.
15          Similarly, Acis also wants the case to proceed in its
16   home court where it has enjoyed success in litigating against
17   the debtor.  Your Honor mentioned the conflicts-of-interest
18   theories.  They're not just conflicts of interest between two
19   jointly administered debtors.  These go to the crux of what the
20   Acis case is about and significant claims against the debtor.
21          The Court may ask, appropriately -- and the Court
22   did -- why would the debtor file the case in Delaware?  Chapter
23   11 is all about a fresh start.  The debtor recognized concerns
24   that the creditors had with certain aspects of its pre-petition
25   conduct, and proactively appointed Brad Sharp as chief

1   restructuring officer with expanded powers, to oversee the

2   debtor's operations.

3          Mr. Sharp worked with the debtor and Counsel to craft

4   a protocol for transactions that would be subject to increased

5   transparency.  The debtor didn't have to do that.  As Your

6   Honor mentioned at the first-day hearing, the debtor operates

7   its business in the ordinary course.  But given the

8   circumstances surrounding this case, given the history, we

9   felt, and the CRO, importantly, felt it was important to get on

10  the table what the debtor, through the CRO, believed was

11  ordinary and what was not, so we could have a transparent

12  discussion, discussion that, while we've made headway with the

13  committee, we have not yet been able to come to an agreement.

14         The debtor filed the case in this district because it

15  wanted a judge to preside over this case that would look at

16  what's going on with this debtor, with this debtor's

17  management, this debtor's post-petition conduct, without the

18  baggage of what happened in a previous case, which contrary to

19  what Acis and the committee says, has very little to do with

20  this debtor.

21         These form insufficient grounds, Your Honor, to

22  overturn the debtor's choice of venue, and the motion should be

23  denied.

24         I would like to now walk through the statutory

25  analysis, something that Counsel avoided, because again, I

Case 19-12239-CSS   Doc 181   Filed 12/03/19   Page 90 of 137
Case 3:21-cv-01010-E   Document 4   Filed 07/21/21   Page 14 of 153   PageID 69

HIGHLAND CAPITAL MANAGEMENT, L.P.                    90

1  more convenient.  And this is really the crux, which I'll spend

2  some time over the next few minutes.

3          Texas is more convenient -- convenient -- because the

4  Texas bankruptcy court, where Acis is pending has, in their

5  words, already expended great time and effort familiarizing

6  itself with the debtor and its operations.  You've heard

7  statements like "learning curve".  You heard statements about

8  everything that the debtor -- that Judge Jernigan has found out

9  about this debtor, and how important and how helpful it is, and

10 how Your Honor will be behind the learning curve.  We just

11 don't buy that, Your Honor.

12         And aside from that argument, the arguments that the

13 committee makes for transfer are arguments that could be made

14 in any case before Your Honor.

15         THE COURT:  Yeah, I was going to say that's kind of an

16 interesting argument, because actually it assumes Judge

17 Jernigan's going to ignore the rules of evidence in making

18 factual findings, because you're limited to the record before

19 you on a specific motion.  And what fact you may have learned

20 with regard to something a person has done, maybe that goes

21 into questions of credibility on cross-examination or direct

22 testimony, but to actually base your decision on a fact that's

23 not in the record for the specific proceeding would be

24 improper.

25         MR. POMERANTZ:  Look, I agree, Your Honor.  And the

Case 19-12239-CSS    Doc 181    Filed 12/03/19    Page 116 of 137
Case 3:21-cv-01010-E   Document 4   Filed 07/21/21    Page 15 of 153   PageID 70

116

1

2                                    C E R T I F I C A T I O N

3

4       I, Clara Rubin, certify that the foregoing transcript is a true

5       and accurate record of the proceedings.

6

7

8

9

10                                                    December 3, 2019

11      _____        _____

12      CLARA RUBIN                             DATE

13

14      eScribers, LLC

15      352 Seventh Avenue, Suite #604

16      New York, NY 10001

17      (973) 406-2250

18      operations@escribers.net

19

20

21

22

23

24

25

# Exhibit 2

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) |
| | ) |
|              Debtor. | ) |
| | ) |
| ───────────────────────────── | ) |
| | ) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | ) Adv. Proc. No. 20-03195-sgj |
| | ) |
| | ) PLAINTIFF'S MOTION for |
|          Plaintiff, | ) CONTINUANCE |
| | ) |
|       v. | ) |
| | ) |
| CLO HOLDCO, LTD., et al., | ) |
| | ) |
|        Defendants. | ) |
| | ) |
| ───────────────────────────── | ) |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Adv. Proc. No. 21-03003-sgj |
| | ) |
|          Plaintiff, | ) |
| | ) DEFENDANT DONDERO'S MOTION |
|       v. | ) to COMPEL DISCOVERY, the |
| | ) TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) SEERY, JR. |
| | ) |
|        Defendant. | ) May 20, 2021 |
| ───────────────────────────── | ) Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

| | |
|---|---|
| For Plaintiff Highland Capital Management, | John A. Morris<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, California  90067 |
| For Defendant-Movant James Dondero: | Michael P. Aigen<br>Stinson, L.L.P.<br>3102 Oak Lawn Avenue, Suite 777<br>Dallas, Texas  75219 |
| | Bryan C. Assink<br>Bonds Ellis Eppich Schafer Jones LLP<br>420 Throckmorton Street, Suite 1000<br>Forth Worth, Texas  76102 |

Appearances continued on next page.

2

Appearances in 20-3195:

| For the Official<br>Committee of<br>Unsecured Creditors: | Paige Holden Montgomery<br>Sidley Austin LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, Texas  75201 |
|---|---|
| | Matthew A. Clemente<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois  60603 |
| For Defendants<br>Highland Dallas<br>Foundation and<br>CLO Holdco Ltd.: | Louis M. Phillips<br>Kelly Hart & Pitre<br>301 Main Street, Suite 1600<br>Baton Rouge, Louisiana  70801 |
| | Amelia L. Hurt<br>Kelly Hart & Pitre<br>400 Poydras Street, Suite 1812<br>New Orleans, Louisiana  70130 |
| For Defendants The<br>Dugaboy Investment<br>Trust and The Get<br>Good Nonexempt Trust: | Douglas S. Draper<br>Heller, Draper, Patrick & Horn, L.L.C.<br>650 Poydras Street, Suite 2500<br>New Orleans, Louisiana  70130-6103 |
| For Grant James<br>Scott, III: | John J. Kane<br>Kane Russell Coleman Logan<br>Bank of America Plaza<br>901 Main Street, Suite 5200<br>Dallas, Texas  75202 |
| For UBS Securities<br>LLC: | Andrew Clubok<br>Latham & Watkins, LLP<br>555 Eleventh Street, NW, Suite 1000<br>Washington, D.C.  20004-1304 |
| For Scott Ellington,<br>Jean Paul Sevilla,<br>Isaac Leventon, and<br>others: | Frances Smith<br>Ross & Smith, PC<br>Plaza of the Americas<br>700 North Pearl Street, Suite 1610<br>Dallas, Texas  75201 |
| Digital Court<br>Reporter: | United States Bankruptcy Court<br>Michael F. Edmond Sr., Judicial<br> Support Specialist<br>1100 Commerce Street, Room 1254<br>Dallas, Texas  75242 |
| Certified Electronic<br>Transcriber: | Susan Palmer<br>Palmer Reporting Services |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

1    it's relevant if loans were made to other employees or officers

2    besides Mr. Dondero and it's relevant if those loans were

3    forgiven or not as to these three notes?

4              MR. AIGEN:  Correct, Your Honor.  Because they are

5    challenging that this agreement took place, for the —

6              THE COURT:  Well, —

7              MR. AIGEN:  — fact that other similar —

8              THE COURT:  — what if they did do this with another

9    employee, why is that relevant these three notes?

10             MR. AIGEN:  Well, because they're challenging that our

11   oral agreement took place.  The fact that oral agreements like

12   this were routine at Highland would make it more believable and

13   factual that our agreement took place, in light of their

14   challenge to the fact that the agreement took place.

15             Like I said, if they were just making legal challenges

16   to whether the agreement is enforceable, that would be one

17   thing.  So instead they're also taking the position, hey, we

18   don't think this actually took place.  So all — if Highland

19   routinely entered into agreements like this for other employees,

20   like I said, I understand that wouldn't be dispositive, but that

21   would tend to show that this pattern and practice of Highland

22   did include oral agreements like this.

23             THE COURT:  Okay.  I don't mean to get off on a

24   tangent here, but, you know, are there going to be a lot of

25   fraudulent-transfer lawsuits if in fact there was debt forgiven

1    in the couple of years or four years leading up to bankruptcy?

2    And are we going to have — well, I just don't understand, you

3    know, the obvious big tax exposure to your client and other

4    human beings if your — if your argument prevails, but I guess I

5    shouldn't — I shouldn't second guess legal strategy, but my

6    brain can't help to go there.

7           All right.  But, again to the relevance, your defense

8    is:  There was an agreement to forgive these notes.  It was oral

9    and we're entitled to discovery regarding other loans to other

10   employees for which there might have been oral forgiveness

11   because that will help establish our defense; that's the sum and

12   substance of categories 14 through 17?

13           MR. AIGEN:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MR. AIGEN:  And obviously I don't think there's any

16   need to try the ultimate legal issues here, but we're well aware

17   of these tax issues and we've worked into it, and so there are

18   different tax consequences depending on how conditions are

19   structured and it's my understanding that in situations like

20   this there wouldn't be sort of tax consequences, but that's an

21   issue for another day.  But because you raised it, Your Honor, I

22   want to make sure that you know we are aware of that issue and

23   that is something we're prepared to address when it — when it

24   comes before this.

25           So should I move on to the last — last topic, Your

1   topics.

2          MR. MORRIS:  Because there is no way to prepare a

3   witness for the vague statements that are being offered by

4   counsel.  I'll point out that Mr. Aigen is yet another former —

5   a lawyer who formerly represented Highland and is now suing us,

6   but we'll dispense with the disqualification motion right now.

7          Your Honor, here is the deal.  There have to be some

8   limits, there have to be some reasonable limits.  As you

9   started, Your Honor, in law school you're taught that a

10  collection case under demand notes is the simplest thing there

11  is.  In fact, in New York there's a special provision in state

12  law that permits a plaintiff to file a motion for summary

13  judgment in lieu of a complaint when they have an instrument

14  such as a note, which is exactly what we have here.

15         Mr. Dondero has already admitted in his answer, in his

16  interrogatories, and in his answers to several requests to admit

17  that the notes are valid, that he received the money

18  contemporaneously with the notes.  When he signed the note, he

19  received the money.  The debtor has made demand and he hasn't

20  paid, so we will be moving for summary judgment on that basis.

21         So let's look at what the defenses are and why we just

22  feel like it's a burden on the debtor to even entertain these

23  concepts.  His first answer, Your Honor, said that the notes

24  were forgiven based on an agreement.  So we asked him in the

25  interrogatory or request to admit, I forget which, show us your

```
State of California              )
                                 )     SS.
County of San Joaquin            )
```

        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify that I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

```
Susan Palmer
Palmer Reporting Services

Dated May 22, 2021
```

**App. 18**

# Exhibit 3

CASE NO. 3:21-CV-00879-K

**IN THE UNITED STATES DISTICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

HIGHLAND CAPITAL MANAGEMENT, L.P.,

(Debtor)

JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,
NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD
TRUST, AND NEXPOINT REAL ESTATE PARTNERS, LLC,

(Appellants)

v.

HON. STACEY G.C. JERNIGAN AND HIGHLAND CAPITAL MANAGEMENT, L.P.

(Appellees)

On appeal from the United States Bankruptcy Court for the
Northern District of Texas, Dallas Division

**APPELLANTS' BRIEF**

Respectfully submitted by:
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
***Counsel for Appellants***

1934054210629000000000000003

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 8012 of the FEDERAL RULES OF BANKRUPTCY PROCEDURE, and without waiver of any defenses and/or objections that they may have, Appellants James Dondero ("Mr. Dondero"), Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.,[1] The Dugaboy Investment Trust, The Get Good Trust (collectively, The Dugaboy Investment Trust and The Get Good Trust are, at times, the "Trusts"), and NexPoint Real Estate Partners, LLC ("Appellants") state as follows:

(a) No publicly-held company owns 10% or more of Highland Capital Management Fund Advisors, L.P., nor does it have a parent corporation;

(b) No publicly-held company owns 10% or more of NexPoint Advisors, L.P., nor does it have a parent corporation;

(c) No publicly-held company owns 10% or more of The Dugaboy Investment Trust, nor does it have a parent corporation;

(d) No publicly-held company owns 10% or more of The Get Good Trust, nor does it have a parent corporation; and

(e) No publicly-held company owns 10% or more of the NexPoint Real Estate Partners, LLC, nor does it have a parent corporation.

---

[1] At times herein, Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. are collectively referred to as the "Advisors."

**App. 21**

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE STATEMENT** ............................................................ ii

**TABLE OF CONTENTS** ....................................................................................... iii

**TABLE OF AUTHORITIES** ................................................................................. iv

**JURISDICTIONAL STATEMENT** ......................................................................... 1

**STATEMENT REGARDING ORAL ARGUMENT** .................................................. 1

**ISSUES PRESENTED** ............................................................................................ 1

**I.  STATEMENT OF FACTS AND PROCEEDINGS BELOW** ............................... 2

   **A.  Debtor has acknowledged the Bankruptcy Court's predisposition.** ............................. 2

   **B.  The Bankruptcy Court has acknowledged it holds permanent negative views of Mr. Dondero.** ......................................................................... 3

   **C.  Various events in the Highland Bankruptcy demonstrate that the Bankruptcy Court holds a perceptible, interfering bias against Mr. Dondero.** ........................... 4

   **D.  Recusal is necessary for the pending and future Adversary Proceedings.** ............. 14

**II.  SUMMARY OF THE ARGUMENT** ............................................................... 14

**III.  ARGUMENTS & AUTHORITY** ................................................................... 17

   **A.  Appellants' Motion was timely.** ............................................................... 17

   **B.  The Bankruptcy erred in denying the Motion on the merits.** ....................... 19

   **C.  Recusal was and remains proper** ............................................................. 26

**IV.  CONCLUSION AND PRAYER** .................................................................... 26

**CERTIFICATE OF COMPLIANCE** ..................................................................... 27

**CERTIFICATE OF SERVICE** ............................................................................. 27

**App. 22**

# TABLE OF AUTHORITIES

**Cases**

*Andrade v. Chojnacki*,
   338 F.3d 448, 454 (5th Cir. 2003) ........................................ 21

*Bell v. Johnson*,
   404 F.3d 997, 1004 (6th Cir. 2005) ....................................... 24

*Bloom v. Illinois*,
   391 U.S. 194, 205 (1968) ............................................... 22

*Burke v. Regalado*,
   935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted) .................. 16, 20

*Caperton v. A.T. Massey Coal Co.*,
   556 U.S. 868, 877 (2009) ............................................... 22

*Davies v. C.I.R.*,
   68 F.3d 1129, 1130-31 (9th Cir. 1995) ................................ 17, 18

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280, 1295 (9th Cir.1992) ...................................... 18

*Ferrera-Parra v. United Airlines, Inc.*,
   No. 4:19-CV-1053, 2021 WL 1795702, at *3 (S.D. Tex. Mar. 30, 2021) ....... 16, 20

*Haskett v. Orange Energy Corp.*,
   161 F. Supp. 3d 471, 473 (S.D. Tex. 2015) ............................... 16, 20

*In re Chevron U.S.A., Inc.*,
   121 F.3d 163, 165 (5th Cir. 1997) ...................................... 22

*In re Drexel Burnham Lambert Inc.*,
   861 F.2d 1307, 1313 (2d Cir. 1988) ..................................... 21

*In re Kansas Pub. Employees Retirement Sys.*,
   85 F.3d 1353, 1358 (8th Cir.1996) ...................................... 16, 20

*Johnson v. Mississippi*,
   403 U.S. 212, 216 (1971) (per curiam) .................................. 22

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847, 860 n. 8 (1988) ......................................... 16, 20, 21

iv

**App. 23**

*Liteky v. United States,*
   510 U.S. 540, 551 (1994) ........................................................................ 24, 26

*Marshall v. Jerrico, Inc.,*
   446 U.S. 238, 242 (1980) ........................................................................ 21, 22

*Miller v. Sam Houston State University,*
   986 F.3d 880, 893 (5th Cir. 2021) .......................................................... 16, 24

*Republic of Panama v. Am. Tobacco Co.,*
   217 F.3d 343, 346 (5th Cir. 2000) ................................................................ 21

*United States v. Bremers,*
   195 F.3d 221, 226 (5th Cir. 1999) ............................................................... 21

*United States v. Jordan,*
   49 F.3d 152, 155 (5th Cir. 1995) ................................................................. 24

*United States v. Sanford,*
   157 F.3d 987, 989 (5th Cir. 1998) ............................................................... 17

*Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents,*
   878 F.3d 147, 161 (5th Cir. 2017) ................................................................. 8

**STATUTES**

11 U.S.C. §§ 105 ............................................................................................... 6

11 U.S.C. §§ 363 ............................................................................................... 6

11 U.S.C. §§ 1107 ............................................................................................. 6

28 U.S.C. § 144 ............................................................................................... 17

28 U.S.C. § 455 ................................................................................................. 2

28 U.S.C. §§ 158 ............................................................................................... 1

28 U.S.C. §§ 1334 ............................................................................................. 1

**OTHER AUTHORITIES**

H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong.
   & Admin. News 6351, 6355 ..................................................................... 21, 22

Investment Advisers Act of 1940 ..................................................................... 5

**App. 24**

Investment Company Act of 1940 ................................................................ 5

Section 105 of the Bankruptcy Code ........................................................... 25

section 363(c)(1) or 1108 of the Bankruptcy Code .................................... 6

**RULES**

FED. R. BANKR. P. 2015.3(a) ........................................................................ 25

FED. R. BANKR. P. 5004 ................................................................................. 2

FED. R. BANKR. P. 8001 ................................................................................. 1

**App. 25**

## <u>JURISDICTIONAL STATEMENT</u>

Appellants file this Appellants' Brief regarding their April 1, 2021 appeal[2] from a final order entered by Judge Jernigan in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (hereinafter referred to as the "<u>Bankruptcy Court</u>") on March 23, 2021.[3]

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 158 & 1334 and Rules 8001 et. seq. of the FEDERAL RULES OF BANKRUPTCY PROCEDURE.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellants respectfully request oral argument, which they believe will aid the Court in deciding this matter.

## <u>ISSUES PRESENTED</u>

1.    Whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely.[4]

2.    Whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits.

---

[2] R. 1, Appellants' Notice of Appeal (amended on April 6, 2021, R. 16).
[3] R. 31, the Order.
[4] R. 2338, the Motion to Recuse; R. 2342, the Brief in Support; and R. 2379, the Appendix in Support.

**App. 26**

Appellants[5] file this Brief in Support of their Appeal of the Bankruptcy Court's Order (the "Order") Denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 (the "Motion")[6] and would, in support thereof, respectfully show the Court as follows:

## I.     STATEMENT OF FACTS AND PROCEEDINGS BELOW

### A.  Debtor has acknowledged the Bankruptcy Court's predisposition.

1.      On October 16, 2019, Debtor Highland Capital Management, L.P. ("Highland" or "Debtor") filed bankruptcy in Delaware (the "Highland Bankruptcy") to get a "fresh start."[7] Highland's creditors, including Acis (a debtor in a previous bankruptcy case before the Bankruptcy Court that involved Mr. Dondero (the "Acis Bankruptcy")), moved to transfer this case to the Northern District of Texas seeking to have it assigned to the Bankruptcy Court. In the hearing, Debtor's current counsel, Jeff Pomerantz, expressly acknowledged that the "fresh start" was needed because the Bankruptcy Court had pre-existing, negative views of Debtor's management, including Mr. Dondero:

> … the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.[8] … ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[9]

2.      Debtor further acknowledged that the Bankruptcy Court's predisposition against Mr. Dondero would render it incapable of being impartial and, thus, improperly impact the Highland Bankruptcy. In fact, Mr. Pomerantz specifically referred to the Bankruptcy Court's opinions of Mr. Dondero as "***baggage***."[10] Ultimately, the Delaware bankruptcy court transferred the case,[11]

---

[5] For efficiency, Appellants are jointly represented by a single counsel for purposes of the Motion and this appeal.
[6] 28 U.S.C. § 455 has been made applicable to bankruptcy judges under FED. R. BANKR. P. 5004.
[7] R. 2382, the December 3, 2019 Transcript - Motion to Transfer, at 78:21-23 (R. 2459).
[8] *Id*. at 77:18-22 (R. 2458).
[9] *Id.* at 78:3-8 (emphasis added) (R. 2459).
[10] *Id.* at 79:14-20 (emphasis added) (R. 2460).
[11] *Id.* at 90:15-24 (emphasis added) (R. 2471).

**App. 27**

which was assigned to Judge Jernigan.

**B. The Bankruptcy Court has acknowledged it holds permanent negative views of Mr. Dondero.**

3.      Although the Order attempts to downplay the impact of the Acis Bankruptcy, the record contradicts that insinuation. For example, during a January 9, 2020 hearing on a compromise regarding the management of Debtor (the "Compromise"), the Bankruptcy Court acknowledged that it: (a) possessed opinions regarding Mr. Dondero; (b) was unable to extract those opinions from its brain; and (c) was relying on those opinions *as a basis* for requiring certain language about Mr. Dondero's involvement with Debtor be included in the Compromise order.[12]

4.      Notably, at this time, the Highland Bankruptcy had only been in the Bankruptcy Court for approximately a month. There was nothing in the Highland Bankruptcy record to justify the Bankruptcy Court's specific rulings and comments related to Mr. Dondero. Later, the Bankruptcy Court reiterated that it was relying on its knowledge from the Acis Bankruptcy to support its requirements regarding the contempt language directed at Mr. Dondero in the Compromise order:

> And *I'm sure most of you can read my mind why*, but I want it crystal clear that if [Mr. Dondero] violates these terms, he's violated a federal court order, and contempt will be one of the tools available to the Court.[13]

Importantly, the Bankruptcy Court made these references to the Acis Bankruptcy, despite refusing to admit an order from the Acis Bankruptcy as evidence during the same hearing because the order was prejudicial.[14] Thus, the information the Bankruptcy Court relied upon was not in evidence.

---

[12] R. 2519, the January 9, 2020 Transcript at 14:4-11 (R. 2532) and at 78:23-79:16 (R. 2596-2597) (emphasis added). Mr. Dondero, however, remained a portfolio manager and an unpaid employee of Debtor. *Id*.
[13] *Id*. at 80:3-6 (R. 2598).
[14] *Id*. at 57:1-59:17 (R. 2575-2577).

**App. 28**

**C. Various events in the Highland Bankruptcy demonstrate that the Bankruptcy Court holds a perceptible, interfering bias against Mr. Dondero.**

### 1.     The February 19, 2020 Application to Employ Hearing

5.      One of the ways the Bankruptcy Court's predisposition against Mr. Dondero manifested itself was through its rulings, including, for example, rulings dismissing the uncontroverted testimony of independent witnesses who testified in support of outcomes that could possibly benefit Mr. Dondero as testimony that was engineered by Mr. Dondero.

6.      For example, on February 19, 2020, the Court held a hearing on Debtor's application to retain a law firm to, among other things, appeal an order against Neutra Ltd. ("Neutra") (a company owned by Mr. Dondero). A successful appeal would: (a) defeat a $75 million claim against Debtor; and (b) result in Neutra owning Acis and Debtor being reinstated as the advisor to Neutra, which would generate fees and economic benefit for Debtor.[15] Debtor's independent board, which included former Bankruptcy Judge Russell Nelms, determined that engaging the firm to represent Neutra was in the Debtor's best interest.[16] Nevertheless, the Court concluded, without evidence, that Debtor's fully independent board was being unduly influenced by Mr. Dondero:

> … ***But I'm concerned that Dondero*** or certain in-house counsel has -- you know, they're smart, they're persuasive -- that -- what are the words I want to look for -- they have ***exercised their powers of persuasion*** or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these appeals, ***when it's really all about Neutra, HCLOF, and Mr. Dondero. That's what I believe***.[17]

At the same hearing, the Bankruptcy Court indicated that it believed Mr. Dondero lacked credibility even though, at that point in time, Mr. Dondero had not yet testified.[18]

---

[15] *See* R. 2610, the February 19, 2020 Transcript at 38:22-39:17 (R. 2647-2648) (emphasis added).
[16] *Id.* at 62:6-17 (R. 2671) (emphasis added).
[17] *Id.* at 177:7-178:3 (R. 2786-2787).
[18] *Id.* at 174:22-175:1 (R. 2783-2784).

### 2. The December 2020 Restriction Motion

7.    A second instance involves a motion for injunctive relief that was filed by entities (not including Mr. Dondero) involving certain collateralized loan obligation investment vehicles ("CLOs") that Debtor manages pursuant to Portfolio Management Agreements (the "PMAs"). Generally, the PMAs impose a duty on Debtor, as portfolio manager, to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preference shareholders. The Retail Funds, which are governed by independent boards and owned primarily by third-party investors, collectively invested approximately $368 million in the CLOs.[19] Importantly, Debtor does not own an interest in the CLOs, and, thus, the CLOs are ***not assets of Debtor's estate***.

8.    In approximately October 2020, Debtor decided to assume the PMAs (*i.e.*, continue managing the assets), release all Debtor's employees, and simultaneously liquidate the CLOs' assets over a two-year period. The Retail Funds and the Advisors (on behalf of the Retail Funds and pursuant to their obligations under their respective advisory agreements)[20] believed this decision would: (a) fail to maximize the value of the investments for the investors to whom the Advisors and the Retail Funds owed a fiduciary duty; and (b) was incompatible with the CLOs' needs (which required an investment staff). Mr. Dondero, who was still a portfolio manager and unpaid employee of Debtor at that time, also disagreed with Debtor's decision to liquidate.

---

[19] Highland Income Fund ("HFRO"), NexPoint Strategic Opportunities Fund ("NHF"), and NexPoint Capital, Inc., publicly traded funds advised by the Advisors (defined below) are, at times referred to herein as the "Retail Funds."

[20] The "Advisors" are Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. Each Advisor is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment advisor under the Investment Advisers Act of 1940, as amended. Each of the Advisors advises several funds, including the Retail Funds, which are primarily owned by third-party, "mom and pop" investors. Each of the Retail Funds is a registered investment company or business development company under the Investment Company Act of 1940 (as amended, the "1940 Act"). Each Retail Fund is overseen by a majority independent board of trustees subject to 1940 Act requirements. Those respective boards reviewed and approved, among other things, major contracts including the advisory agreement with the applicable Advisor for the respective Retail Fund. The Retail Funds do not have employees and rely on their respective Advisors, acting pursuant to an advisory agreement, to provide the services necessary for their operations.

5

**App. 30**

9.     The Advisors and the Retail Funds raised these same issues with Mr. Seery (Debtor's interim CEO) and requested that Debtor not liquidate the CLOs until the confirmation of Debtor's Plan of Reorganization, as further modified (the "<u>Plan</u>")  (which was, at that time, scheduled for early January 2021). Debtor, as portfolio manager, declined and began attempting to leverage the Bankruptcy Court's increasingly perceptible bias against Mr. Dondero for Debtor's benefit. This manifested in a variety of ways.[21]

10.     On December 8, 2020, because the Plan violated its statutory and contractual obligation to maximize the value of the CLO assets, pursuant to 11 U.S.C. §§105, 363, and 1107, the Advisors and the Retail Funds (*i.e.*, <u>*not*</u> Mr. Dondero) moved to maintain the status quo and prohibit Debtor from liquidating the CLOs for approximately 30 days  (the "<u>Restriction Motion</u>").[22]

11.     On December 16, 2020, despite the express statutory basis, the Bankruptcy Court denied the Restriction Motion,[23] stating that it was "dumbfounded" by the motion and declaring the motion as having no statutory or contractual basis and being "almost Rule 11 frivolous."[24] Moreover, while the only evidence demonstrated that the Advisors' and Retail Funds' senior management and independent counsel decided to bring the Restriction Motion, the Bankruptcy Court inscrutably blamed Mr. Dondero for the Restriction Motion.[25] The Bankruptcy Court disregarded the Retail Funds' (publicly-traded, highly-regulated entities) and the Advisors' ability to independently decide to pursue action they deem in their best interest.

---

[21] *See* R. 3892, the March 4, 2020 Transcript at 34:6-35:18 (R. 3925-3926); 50:14-52:15 (R. 3941-3942); 58:17-23 (R. 3949).
[22] R. 2798-2823, the Restriction Motion.
[23] *See* R. 2824, the December 16, 2020 Transcript at 63:5-13 (R. 2886).
[24] *Id*. at 64:1-7 (R. 2887). The statutory basis for the relief requested was section 363(c)(1) or 1108 of the Bankruptcy Code, which generally provides that a debtor-in-possession may engage in its ordinary course of business, "unless the court orders otherwise." That was all that was being asked.
[25] *Id*. at 63:14-25 (R. 2886).

6

### 3. Debtor's Motion for Injunctive Relief

12. The Bankruptcy Court, however, took a different view of motions filed by Debtor. In December of 2020, K&L Gates, as counsel for the Advisors and the Retail Funds, wrote Debtor to: (a) reiterate the Advisors' and the Retail Funds' objection to Debtor liquidating the CLOs; and (b) notify Debtor that the Retail Funds, ***subject to applicable bankruptcy law*** and the underlying agreements, intended to initiate the procedure to remove Debtor as fund manager of the CLOs (the "K&L Gates Letters").[26]

13. On January 6, 2021, Debtor filed an adversary proceeding seeking to enjoin[27] the Advisors and the Retail Funds from, among other things, exercising any contractual rights that they may have had to remove Debtor as portfolio manager (a contract that Debtor assumed under its plan).

14. On January 26, 2021, the Court commenced the preliminary injunction hearing on the matter (the "Injunction Hearing").[28] The issue at that hearing was whether the Advisors and the Retail Funds tortiously interfered with the PMAs by: (a) hindering Debtor's ability to sell certain CLO assets; (b) threatening to initiate the process for removing Debtor as the portfolio manager of the CLOs; and (c) otherwise attempting to influence and interfere with Debtor's decisions concerning the purchase or sale of any assets on behalf of the CLOs.[29]

15. During the Injunction Hearing, it became clear that there was no basis for the claims or an injunction. In fact, Mr. Seery/Debtor admitted that:

    (a) none of the alleged actions caused Debtor to breach any contract with a third party;[30]

    (b) the Advisors and the Retail Funds had no contractual obligation to settle the trade (the basis of the alleged hinderance with Debtor's ability to sell CLO

---

[26] R. 4158-4172, the K&L Gates Letters.
[27] R. 2890-2908, *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al.* Adversary No. 21-03000-sgj.
[28] R. 2909, the January 26, 2021 Transcript.
[29] *See* R. 8069, Dkt. 1 in Adversary Proceeding No. 21-03000-sgj at ¶ 58 (R. 8082).
[30] *See* R. 2909, the January 26, 2021 Transcript, at 180:12-17 (R. 3088).

assets);[31]

(c) every trade that he attempted to initiate in December (the period in question) closed;[32]

(d) the Debtor's business activities were unaffected by the K&L Gates Letters;[33] and

(e) the K&L Gates Letters merely stated that the Advisors and the Retail Funds were "contemplating taking steps to terminate the CLO Agreements"[34] and no action was taken to remove Debtor as the portfolio manager.

16.     Debtor never disputed that the Advisors and the Retail Funds were third-party beneficiaries under the PMAs with a conditional right to terminate the Portfolio Manager.[35] In addition, one cannot generally tortiously interfere by exercising one's own contractual rights and the law does not recognize any claim for "contemplating" action that was never taken.[36] Consequently, Debtor's motion was objectively baseless.

17.     Nevertheless, at the hearing, rather than comment on the groundlessness of Debtor's motion, the Bankruptcy Court *focused on Mr. Dondero*, warning him that he was prohibited from terminating any agreement with Debtor[37] and stated that it was "leaning" toward finding ***Mr. Dondero*** in contempt and shifting the "whole bundle of attorney's fees" to Mr. Dondero as a result

---

[31] Notably, Debtor itself had numerous authorized traders, whose job was to settle Debtor's trades.

[32] *See* R. 2909, the January 26, 2021 Transcript, at 173:16-19 (R. 3081); 174:1-3 (R. 3082); 174:8-175:5 (R. 3082-3083).

[33] *Id.* at 178:14-24 (R. 3086).

[34] *Id.* at 103:21-23 (R. 3011).

[35] *See* R. 4747-4782 and 4783-4821, examples of Servicing Agreements at section 14 (R. 4762-4763); *see also* R. 4452, the February 2, 2021 Transcript of Hearing at 54:6-56:12 (R. 4505-4507); *see also* R. 5079-5080, a chart of holdings of preference shares in CLOs (showing Movants are preferred shareholders); *see also* R. 4822, February 3, 2021 Transcript of Hearing at 53:1-22 (R. 4874).

[36] *See, e.g., Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*, 878 F.3d 147, 161 (5th Cir. 2017) (To win, Wilkerson would have to prove that his employer interfered with his employment contract—a legal impossibility, as "one cannot tortiously interfere with one's own contract.").

[37] R. 3166, the January 8, 2021 Transcript, at 119:6-122:25 (R. 3284-3287). Notably, the Bankruptcy Court made the implied finding that Mr. Dondero caused the Retail Funds to send the K&L Gates Letters even though, in a hearing just a week earlier, it *sustained* Debtor's objections to Mr. Dondero testifying about the K&L Gates Letters because*: (a) Mr. Dondero lacked personal knowledge;* (b) any answer would be hearsay; and (c) the K&L Gates Letters (executed by K&L Gates, not Mr. Dondero) speak for themselves. Otherwise, Mr. Dondero should have been given the opportunity to answer the question, which the Court denied.

**App. 33**

of this unwarranted motion filed by ***Debtor***.[38]

### 4.    The February 2021 Confirmation Hearing

18.     On February 2 and 3, 2021, the Court held a hearing on the Plan. The Advisors and the

Retail Funds objected to provisions in the Plan that eliminated or altered their legal and contractual

claims against Debtor under the PMAs (the "Objections"). Additionally, Appellants objected to

the Plan's release and exculpation provisions for the management of Debtor and the Plan's

"gatekeeper" provision that prohibited lawsuits against any exculpated party without prior

permission from the Bankruptcy Court.

19.     On February 8, 2021, the Court summarily rejected ***all*** of the Objections,[39] questioned the

good faith basis for the Objections, and declared that it "***ha[d] good reason to believe*** that [those]

parties [were] not objecting to protect economic interests they have in the Debtor, but to be

disruptors."[40] The Bankruptcy Court, again without basis, concluded that the other entities

objecting to the Plan were "controlled by" Mr. Dondero:[41]

> …the Court has allowed all of these objectors to fully present arguments and
> evidence in opposition to confirmation, even though their economic interests in the
> Debtor appear to be extremely remote and the Court questions their good faith.
> Specifically on that latter point, ***the Court considers them all to be marching
> pursuant to the orders of Mr. Dondero***.[42]

20.     In doing so, the Bankruptcy Court disregarded witness testimony on the sole ground that

the witness had, in coordination with Debtor, recently transitioned from Debtor to one of the

Advisors.

> …While the evidence presented was that [the Advisors and Retail Funds] have
> independent board members that run these companies, the Court was not convinced

---

[38] R. 2909, the January 26, 2021 Transcript, at 251:24-252:5 (R. 3159-3160).
[39] *See* R. 3371, February 8, 2021 Transcript at 15:15-16:5 (R. 3385-3386).
[40] *Id.* at 20:17-20 (R. 3390) (emphasis added).
[41] *Id.* at 20:13-15 (R. 3390).
[42] *Id.* at 22:12-21 (R. 3392).

of their independence from Mr. Dondero.[43]

The witness who testified on these Objectors' behalves at confirmation, Mr. Jason Post, their chief compliance officer, resigned from Highland after more than twelve years in October 2020, at the same time that Mr. Dondero resigned or was terminated by Highland. And a prior witness recently for these entities whose testimony was made part of the record at the confirmation hearing essentially testified that Mr. Dondero controlled these entities.[44]

21.     The Objections were made in good faith.[45] In fact, the U.S. Trustee, whose "good faith basis" was not questioned by the Bankruptcy Court, asserted some of the same objections.[46] Not even the Debtor alleged that the objections were filed bad faith.

22.     Going further, at that hearing, even though no party had requested the Bankruptcy Court "to declare Mr. Dondero and his affiliated entities as vexatious litigants *per se*,"[47] the Bankruptcy Court summarily decreed that Mr. Dondero and any entity the Bankruptcy Court deemed to be controlled by Mr. Dondero (collectively, the "Affected Entities")[48] were "vexatious litigants"[49] and held that the "gatekeeper" provision (which they objected to) "appears necessary and reasonable in light of the *litigiousness of Mr. Dondero* and his *controlled entities*."[50] However, the "litigiousness" the Bankruptcy Court listed to support this ruling consisted of the following:

(a) efforts taken by Mr. Dondero and other entities to defend against injunctions filed against them;

(b) legitimate objections or responses to certain provisions of the Plan and other motions, made to preserve rights on appeal; and/or

---

[43] *Id.* at 21:22-24 (R.3391-3392).
[44] Notably, Jason Post resigned from Debtor and was hired by NPA because NPA and Debtor had to separate compliance programs, which were previously jointly administered.  This decision was discussed with and approved by Thomas Surgent and Mr. Seery.
[45] R. 3371, the February 8, 2021 Transcript, at 23:8-11(R. 3393).
[46] *Id.*
[47] *Id.* at 46:20-22 (R. 3416).
[48] The definition of the "Affected Entities" includes, without limitation, the Advisors and the Retail Funds.
[49] R. 3371, the February 8, 2021 Transcript, at 46:20-25 (R. 3416).
[50] *Id.* at 45-47 (R. 3415-3417) (emphasis added).

**App. 35**

(c) lawsuits in which the pre-petition Debtor **had been sued** and was defending itself.[51]

These actions do not meet the factors necessary to deem someone a "vexatious litigant."[52] In fact, Appellants were not parties to these lawsuits, the record reflected little, if any, litigation and motion practice initiated by Appellants,[53] and notice that the issue of vexatiousness was being alleged or tried was never provided.

### 5.      Other Issues Demonstrating Bias

23.      The Bankruptcy Court's inability to rule impartially because of its preconceived bias against Mr. Dondero and the other Appellants has also manifested itself in other ways.

24.      ***First***, the Bankruptcy Court relied upon extrajudicial information from an article that referenced "Mr. Dondero or Highland affiliates" receiving PPP loans and *sua sponte* directed Debtor's counsel to investigate the loans and report back.[54] However, the PPP loans had ***nothing*** to do with Debtor.[55] Additionally, according to the Order, the Bankruptcy Court's pre-existing negative views of Mr. Dondero had to come from somewhere other than the Acis Bankruptcy. The

---

[51] *See* ECF 891 (Acis Action, in which Debtor filed a 65-page objection that it described as having "numerous basis" and in which USB filed an objection); ECF 895 (UBS Action, in which Debtor filed an objection to the claim and stated that it had, "meritorious defenses to most, if not all, of the UBS Claim …", [ECF 928] and in which the Redeemer Committee of the Crusader Funds also objected); ECF 895 (Daugherty Action, in which Debtor asserted that the Daugherty Claim lacked merit); and Dkt. 1384 (HarbourVest Action, in which Debtor "vigorously defen[ded]" the HarbourVest Claims on numerous grounds).

[52] R. 3371, the February 8, 2021 Transcript, at 46:6-15 (R. 3416) (acknowledging the elements necessary to find a party vexatious are: (a) the party's history of litigation; in particular, whether **he has filed** vexatious, harassing, or duplicative lawsuits; (b) whether the party had a good faith basis for **pursuing the litigation**, or perhaps intended to harass; (c) the extent of the burden on the courts and other parties resulting from the party's filings; and (d) the adequacy of alternatives) (emphasis added).

[53] *See* R. 5081-5093 the Chart regarding this bankruptcy proceeding; *see also* R. 5094-5095, the Chart regarding the injunction proceeding.

[54] *See* R. 3422, the July 8, 2020 Transcript at 42:10-24 (R. 3463) ("THE COURT: Okay. All right. Two more questions. And this one has been a bit of a tough one for me to decide whether I should broach this topic or not. You know, *I read the newspapers, the financial papers, just like everyone else, and I saw a headline that I wished almost I wouldn't have seen, and it was a headline about Dondero or Highland affiliates* getting three PPP loans. *And, you know, I'm only supposed to consider evidence I hear in the courtroom, right, or things I hear in the courtroom, but I've got this extrajudicial knowledge right now thanks to just keeping up on current events. I decided I needed to ask about this*. What can you tell me about this, Mr. Pomerantz? I mean, I assumed, from less-than-clear reporting, that it wasn't Highland Capital Management, LP, but I'd like to hear anything you can report about this.").

[55] *See* R. 3758, the July 14, 2020 Transcript at 53:17-59:3 (R. 3810-3816).

11

**App. 36**

Bankruptcy Court now downplays and dismisses recalling (or the impact of) any specific detail from the Acis Bankruptcy relating to Mr. Dondero.[56]

25.     **Second**, the bias against Mr. Dondero has resulted in rulings against Affected Entities that are not legally supported. For example, CLO Holdco is a wholly owned subsidiary of a charitable Doner Advised Fund ("DAF") established by Mr. Dondero. During the Highland Bankruptcy, CLO Holdco, through its independent trustee, moved to have $2.5 million of its funds released from the registry of the Bankruptcy Court. The Bankruptcy Court admitted that CLO Holdco's lawyer made "perfect arguments" and that continuing to hold a non-debtor's assets in the registry of the Court is "tantamount to a prejudgment remedy."[57] Nevertheless, the Bankruptcy Court, concluded that Mr. Dondero was behind the CLO Holdco filing and, therefore, questioned the "good faith" basis of the motion.[58] Even worse, the Bankruptcy Court acknowledged that it could not continue to hold the funds unless the objecting party obtained injunctive relief, which it has never sought, yet the funds have not been released (presumably because of the Bankruptcy Court's unsubstantiated belief that Mr. Dondero might somehow benefit).[59]

26.     **Third**, in a September 2020 hearing in the Acis Bankruptcy, the Bankruptcy Court learned that the DAF and other entities sued Acis (and other non-Acis or Debtor entities) in New York concerning a post-confirmation dispute. **Without having seen the lawsuit, the Bankruptcy Court declared it vexatious and, again, blamed Mr. Dondero**:

> It's just ridiculous, for lack of a better term, that Dondero and his entities would be doing some of the things it sounds like they're doing: Suing Moody's, for crying out loud, for not downgrading the Acis CLOs. **If Mr. Dondero doesn't think that is so transparently vexatious litigation, yeah, I'm going out there and saying that.**

---

[56] R. 31, the Order at pp. 8-9 (R. 38-39).
[57] *See* R. 3533, the June 30, 2020 Transcript at 85:17-22 (R. 3617).
[58] *Id.* at 82:3-11 (R. 3614); 85:4-16 (R. 3617).
[59] Needless to say, the Affected Entities and every entity that the Court believes has any affiliation with Mr. Dondero are gun-shy about filing any pleading out of fear of "sanctions" or accusations of "bad faith." Conversely, the UCC, which has not alleged any basis for the Bankruptcy Court retaining the $2.5 million, has not been chastised or otherwise threatened.

**App. 37**

> *I haven't seen it, but, come on.*[60]

It is the Bankruptcy Court's admission that, "I haven't seen it," paired with its finding that the suit was "transparently vexatious litigation" that clearly illustrates the need for recusal.[61]

27.     ***Fourth***, the Advisors had a shared services agreement with Debtor in which the Advisors shared office space with Debtor, and each paid Debtor for resources and services. In February of 2021, Debtor terminated that agreement and baselessly moved for a mandatory injunction to force the Advisors and the Retail Funds to describe their plans to replace Debtor after the termination.[62]

28.     The Advisors and the Retails Funds did not contest the termination, which posed no harm to Debtor, and had no obligation to share their transition plan with Debtor following its termination of the shared services agreement. Nevertheless, the Bankruptcy Court held a seven-hour evidentiary hearing on the issue[63] and, while it ultimately held that the mandatory injunction was moot, it went beyond the pleadings and relief requested by Debtor ***to issue findings of fact adverse to Mr. Dondero,***[64] ***which were not even requested in the motion***. Moreover, rather than chastise Debtor's motions as being "almost Rule 11 frivolous," the Bankruptcy Court accused Mr. Dondero (***a non-movant***) of driving up legal fees.[65]

29.     ***Fifth***, the Bankruptcy Court has permitted Debtor a different standard and set of rules than Appellants. In addition to the discrepancies in the Bankruptcy Court's views regarding the good

---

[60] *See* R. 3480, the September 23, 2020 Transcript at 51:10-16 (R. 3530).

[61] Notably, the claims against Moody's relating to its ratings concerning the CLOs were the same issues raised in various lawsuits against Moody's following the 2008 crash. The action asserting the claims was initiated by DAF, an independent charity originally funded by Highland Capital. As a primary investor in the ACIS Collateralized Loan Obligations (CLO), the DAF lost almost 80% of its investment in ACIS CLOs as Josh Terry and sub-advisor Bridge circumvented CLO indenture covenants and materially increased the risk in the portfolio. Recently, JP Morgan highlighted ACIS 3-6 as the worst performing 1094 deals outstanding in 2019 through 2020. This action sought relief from the trustee (US Bank) for failing to properly administer the indenture and from Moody's for failing to update or suspend ratings given the breaches described above.

[62] *See* R. 4173-4193, the Mandatory Injunction.

[63] *See* R. 4199-4437, the February 23, 2021 Transcript on Hearing for Mandatory Injunction.

[64] *See* R. 4194, the order on the Mandatory Injunction at pp. 3-5 (R. 4196-4198).

[65] *See* R. 4199, the February 23, 2021 Transcript on Hearing for Mandatory Injunction 232:3-234:19 (R. 4430-4432).

faith of Debtor's filings versus Appellants', the Bankruptcy Court also permits Debtor a wider latitude to, for example, make corrections and clarifications or present evidence. In particular, while the Bankruptcy Court denied Mr. Dondero's request to re-open evidence to provide the Court with exculpatory evidence in a contempt hearing,[66] it permitted Debtor to walk back a judicial admission regarding the amount of bond Debtor requested from Mr. Dondero and even granted Debtor an entire evidentiary hearing to prove a higher bond amount.[67]

### D. Recusal is necessary for the pending and future Adversary Proceedings.

30.     Importantly, there are numerous adversary proceedings currently pending before the Bankruptcy Court that involve Appellants (collectively, the "Adversary Proceedings").[68] The claims in the Adversary Proceedings include various tort claims, breach of contract claims, and claw-back claims, as well as *alter ego* claims seeking to hold Appellants and others liable for any recovery ordered as to other entities.[69] Each of the Adversary Proceedings will require Appellants to take legal positions and defend themselves, which the Bankruptcy Court is predisposed to considering vexatious and sanctionable (regardless of their validity).

## II.     SUMMARY OF THE ARGUMENT

31.     In March 2021, Appellants moved to recuse the Bankruptcy Court due to its undeniable animus against Mr. Dondero and the resulting prejudicial effect that animus has on the due process

---

[66] *See* R. 7716-7993 and 7994-8068, the transcript regarding the hearing held on Motion for Contempt on March 22 and March 24, 2021.

[67] *See* R. 6599-6680, the transcript regarding the hearing held on Motion to Stay Pending Appeal on March 19, 2021.

[68] The Adversary Proceedings include: *Highland Capital Management L.P. v. NexPoint Advisors, L.P. et. al.*, Adversary Proceeding No. 21-03000; *Highland Capital Management, L.P. v. Nexpoint Advisors, L.P.*, Adversary No. 21-03005,; *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*; Adversary No. 21-03004; *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*; Adversary No. 21-03006, in the United States Bankruptcy Court for the Northern District of Texas; *Highland Capital Management, L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC*, Adversary No. 21-03007; *Highland Capital Management, L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC*, Adversary No. 21-03007; *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*; Adversary No. 21-03010; *Highland Capital Management, L.P. v. James Dondero*; Adversary No. 21-03003; and *Official Committee of Unsecured Creditors v. CLO HOLDCO, LTD, et al.*; Adversary No. 20-03195.

[69] *Id*.

rights of Mr. Dondero, the Trusts, and the Affected Entities.

32.     The Bankruptcy Court entered the Highland Bankruptcy with negative opinions of Mr. Dondero and subsequently the other Appellants by association. Over the course of the Highland Bankruptcy, the Bankruptcy Court's predisposition against Mr. Dondero manifested itself in actions that impaired Appellants' legal rights; favored Appellants' opponents; and created, at a minimum, the clear perception that the Bankruptcy Court was unwilling to act impartially where Mr. Dondero and the Affected Entities were concerned. Specifically, among other things, the record reflects that the Bankruptcy Court has:

    (a)    repeatedly made negative statements about Mr. Dondero and questioned Mr. Dondero's credibility before he ever testified;

    (b)    summarily disregarded the testimony of any witness favorable to Mr. Dondero (or any of the Appellants) as "under [Mr. Dondero's] control" and *per se* not credible;

    (c)    repeatedly concluded, without evidence, that any entity the Bankruptcy Court deemed associated with Mr. Dondero was essentially an agent and no more than a pawn of Mr. Dondero;[70]

    (d)    declared that Mr. Dondero and his "controlled entities" are vexatious litigants because: (i) they defended lawsuits and motions filed against them; and/or (ii) have asserted valid legal positions (including to preserve their and the Affected Entities' legal rights and rights on appeal);

    (e)    issued a *sua sponte* order demanding that so-called "Dondero-Affiliated Entities" disclose their ownership and control, including entities that have not appeared or filed anything in the Highland Bankruptcy; and

    (f)    applied more favorable standards and rules to Debtor than those it afforded to Appellants.

Notably, the Affected Entities' investment base includes public investors beyond Mr. Dondero.[71]

---

[70] Specifically, the evidentiary record does not reflect, *e.g.*, that: (a) the corporate formalities have been ignored for the entities; (b) their corporate property has not been kept separate and apart; or (c) Mr. Dondero uses the companies for personal purposes.
[71] For example, while deemed "Dondero controlled entities," HFRO and NHF are controlled by boards the majority of whom are independent in accordance with NYSE and SEC requirements; Mr. Dondero owns less than 13% of NHF

15

**App. 40**

Appellants brought the Motion to safeguard the impartiality that they are entitled to receive as litigants, regardless of Mr. Dondero's history with the Bankruptcy Court.

33.    The Bankruptcy Court denied the Motion for the following three reasons:

   (a)    The Bankruptcy Court's finding the Motion was untimely;

   (b)    The Bankruptcy Court's subjective belief that it was not biased and that, generally, all of its orders, actions, and findings were proper; and

   (c)    Criticism of counsel (which was not a ground that Appellants asserted in the Motion) did not justify recusal.[72]

34.    The Bankruptcy Court abused its discretion when it denied the Motion. ***First***, Appellants filed the Motion a reasonable time after the Bankruptcy Court's bias manifested itself and only sought relief on a prospective basis. ***Second***, Appellants did not seek recusal based upon "criticism of counsel" or routine docket management actions, and the Bankruptcy Court failed to address the Motion's actual and specific grounds.[73] ***Finally***, and most importantly, a judge's subjective belief that he or she is capable of impartiality[74] or whether the judge ***actually has*** a bias (or actually knows of grounds requiring recusal) is irrelevant.[75] Instead, "[t]he ***appearance*** of impartiality controls the § 455 analysis,"[76] and the test is whether the "'average person on the street who knows all the relevant facts of a case'" might ***reasonably question*** the judge's impartiality.[77]

35.    Appellants, like every litigant, are entitled to the opportunity to make their case in a fair and impartial forum.[78] The impartiality of judges is fundamental to the judiciary and the public's

---

and less than 1% of HFRO; and the remaining interests are owned by third-party, "mom and pop" investors.
[72] R. 31, the Order at pp. 7-10 (R. 37-40).
[73] *Id.*
[74] *Burke v. Regalado*, 935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted).
[75] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 805 (1988).
[76] *Ferrera-Parra v. United Airlines, Inc.*, No. 4:19-CV-1053, 2021 WL 1795702, at *3 (S.D. Tex. Mar. 30, 2021) (citing *Haskett v. Orange Energy Corp.*, 161 F. Supp. 3d 471, 473 (S.D. Tex. 2015)).
[77] *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir.1996).
[78] *Miller v. Sam Houston State Univ.*, 986 F.3d 880, 893 (5th Cir. 2021).

16

confidence in the proceedings over which they preside.[79] Here, recusal of the Bankruptcy Court is the only way to ensure that the Appellants receive the requisite impartiality and fair trial.

## III.  ARGUMENTS & AUTHORITY

### A.  Appellants' Motion was timely.

36.     The Bankruptcy Court held that the Motion was untimely because it was filed: (a) "more than 15 months after the Highland Bankruptcy was transferred;" (b) "after many dozens of orders have been issued by the court, including a confirmation order that Movants have now appealed;" and (c) "on the eve of a contempt hearing."[80] The Bankruptcy Court abused its discretion in finding the Motion untimely.

37.     *First,* unlike 28 U.S.C. § 144, timeliness is not an express condition of a recusal motion under § 455, and the sole case cited by the Bankruptcy Court to the contrary, *Davies v. C.I.R.*, 68 F.3d 1129, 1130-31 (9th Cir. 1995), is factually distinguishable from the facts of this case. Cases finding that a recusal motion was untimely generally involve situations in which the complaining party obtained specific, definitive knowledge that the court had a disqualifying circumstance **and** either: (a) intentionally delayed raising the issue until a strategically advantageous time; or (b) raised the issue for the first time after a final judgment.[81] This includes *Davies*. In *Davies*, the judge notified the complaining party, taxpayers, that he had served as IRS Deputy Counsel and Acting Chief Counsel.[82] The taxpayers did not object at the time but, instead, almost a year later, moved to recuse the judge after he had ruled against them.[83] As such, *Davies* does not support the

---

[79] *Id.*

[80] *See* R. 31, the Order at p. 7 (R. 37).

[81] *See, e.g., United States v. Sanford*, 157 F.3d 987, 989 (5th Cir. 1998) (holding that motion to recuse was untimely because defendant's attorney had testified against judge in judicial council proceedings, but defendant made no motion before district court for recusal in two months before sentencing, or at sentencing itself, and thus, defendant both waited after knowing facts to challenge judge and raised issue for first time on appeal).

[82] *Davies v. C.I.R.*, 68 F.3d 1129, 1130-31 (9th Cir. 1995).

[83] *Id.*

17

**App. 42**

Order.

38.     ***Second***, the general amount of time that passed since the Highland Bankruptcy was transferred from Delaware (*i.e.*, 15 months) is not relevant. The timeliness of a recusal motion is determined from the point a judge's bias (or her appearance of bias) has manifested in the case (*i.e.*, after the grounds for recusal, beyond speculation, are actually known).[84] A judge, suspected of bias, cannot sit on that bias and then—after a certain amount of time passes—take action confirming the bias (or appearance thereof) and claim it is too late to recuse and force a party to be judged by a partial jurist.

39.     Here, the Bankruptcy Court's bias (or appearance thereof) did not immediately show itself such that it would support a recusal motion. While Debtor acknowledged the Bankruptcy Court's preexisting negative views of Mr. Dondero,[85] the presence of preexisting negative views *alone* is not grounds to recuse. As described above, the Delaware bankruptcy court indicated that such arguments (that the Bankruptcy Court's potential bias might negatively impact the case) were premature because the Bankruptcy Court should enjoy a presumption that it would still follow the rules in making findings:

> Yeah, I was going to say that's kind of an interesting argument, because actually it ***assumes Judge Jernigan's going to ignore the rules of evidence*** in making factual findings, ***because you're limited to the record before you on a specific motion***. And what fact you may have learned with regard to something a person has done, maybe that goes into questions of credibility on cross-examination or direct testimony***, but to actually base your decision on a fact that's not in the record for the specific proceeding would be improper***.[86]

40.     Consequently, Appellants hoped the Delaware bankruptcy court was correct and were willing to extend that prescribed presumption to the Bankruptcy Court.

---

[84] *Davies v. C.I.R.*, 68 F.3d 1129, 1130-31 (9th Cir. 1995) (citing *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1295 (9th Cir.1992)).
[85] R. 2382, the December 2, 2019 Transcript, at 78:3-8 (emphasis added) (R. 2459).
[86] *Id.* at 90:15-24 (emphasis added) (R. 2471).

41.    Moreover, while the Bankruptcy Court's language in an earlier January 2020 order is an example of its bias, a single adverse ruling is not grounds for recusal, as it could be an isolated incident. In other words, while a part of the Bankruptcy Court's pattern of bias, a recusal motion based upon this single January 2020 order ruling *alone* would likewise be considered premature.

42.    Here, the Bankruptcy Court's inability to rule impartially in matters involving Mr. Dondero and the Affected Entities did not manifest itself until late 2020 and early 2021, after various comments, events, and rulings, exemplified above. It is *that* manifestation of bias (or appearance of bias) that is the relevant demarcation line as it relates to timeliness of the Motion, and Appellants indisputably filed the Motion a reasonable time thereafter (*i.e.*, March 18, 2021).

43.    ***Third***, the Bankruptcy Court concludes that the Motion was untimely merely because "many dozens of orders have been issued by the court, including a confirmation order that Movants have now appealed."[87] However, the Bankruptcy Court does not identify any order that it claims should have resulted in the Motion being filed earlier. In fact, the sole referenced "Confirmation Order" was entered ***just over a month before the Motion was filed***.

44.    ***Fourth***, the fact that Debtor had filed a motion for contempt and a hearing on that motion was pending when Appellants filed the Motion is further irrelevant. Appellants moved to recuse the Bankruptcy Court from Adversary Proceedings—not from hearing any contempt issue.[88] Consequently, the Bankruptcy Court's finding that the Motion was not timely was an abuse of discretion.

**B.  The Bankruptcy erred in denying the Motion on the merits.**

45.    Next, with respect to the merits, the Bankruptcy Court denied the Motion because: (a) it subjectively believes that it is not biased ("[t]he Presiding Judge does not believe she harbors, or

---

[87] R. 31, the Order, at p. 7 (R. 37).
[88] R. 2338-2378, the Motion (including the Motion and Brief in Support).

has shown, any personal bias or prejudice against the Movants");[89] (b) criticism of counsel did not justify recusal;[90] and (c) without addressing any of Appellants' allegations, the Bankruptcy Court's deemed any statements, criticism and orders proper and concluded that the allegations did not establish "doubt in the mind of a reasonable observer as to the judge's impartiality."[91]

      **1.    The Bankruptcy Court erred in relying on its subjective denials of actual bias.**

46.    It is irrelevant if a judge subjectively believes he or she is capable of impartiality[92] or if the judge actually has a bias (or actually knows of grounds requiring recusal).[93] Instead, "[t]he appearance of impartiality controls the § 455 analysis,"[94] and the test is whether the "'average person on the street who knows all the relevant facts of a case'" might ***reasonably question*** the judge's impartiality.[95] As a result, the Bankruptcy Court abused its discretion in denying Appellants' Motion based upon its subjective declarations and beliefs regarding its bias and the propriety of its actions.

      **2.    Appellants do not seek recusal based upon "criticism of counsel" or routine docket management actions.**

47.    While the Bankruptcy Court denied the Motion based on an assertion that criticism of counsel did not justify recusal,[96] Appellants did not seek recusal on this ground.[97] Instead, Appellants filed the Motion because the Bankruptcy Court's actions (including the non-exhaustive examples described in the Motion and herein) began to reveal a deep-seated antagonism toward Mr. Dondero and the Affected Entities that went well beyond "normal" admonishment—rendering

---

[89] R. 31, at Order at p. 10 (R. 40).
[90] *Id.*
[91] *Id.*
[92] *Burke v. Regalado*, 935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted).
[93] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 805 (1988).
[94] *Ferrera-Parra v. United Airlines, Inc.*, No. 4:19-CV-1053, 2021 WL 1795702, at *3 (S.D. Tex. Mar. 30, 2021) (citing *Haskett v. Orange Energy Corp.*, 161 F. Supp. 3d 471, 473 (S.D. Tex. 2015).
[95] *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir.1996).
[96] R, 31 the Order at p. 10 (R. 40).
[97] R. 2341, the Motion at ¶ 70 (R. 2376).

20

**App. 45**

the perception of fair judgment and impartiality toward Appellants impossible.[98]

48.     Moreover, the only evidence in the Motion that could arguably be considered "criticism of counsel" does not constitute regular admonishment or "criticism of counsel." As alleged in the Motion, the Bankruptcy Court has, among other things: (a) repeatedly threatened sanctions on and questioned Appellants' good-faith basis for: (i) asserting valid legal positions (including in defense of suits and motions filed against them); and/or (ii) preserving their rights (including in the exact same manner in which others are permitted to do so (*e.g.*, the U.S. Trustee's objections to the Plan)); (b) declared a lawsuit Appellants filed as "vexatious" despite admitting that it has never seen the lawsuit; and (c) recommended claims for opposing counsel to bring against Appellants to avoid a reference being withdrawn. This is well beyond ordinary "criticism" and justifies recusal.

### 3.     The Motion's actual and specific grounds, which the Bankruptcy Court failed to address, establish actual bias or an objective appearance of bias.

49.     "The review of a recusal order under § 455(a) is 'extremely fact intensive and fact bound,' thus a close recitation of the factual basis for the [party's] recusal motion is necessary."[99] Moreover, section 455(a), which is "designed to promote public confidence in the impartiality of the judicial process,"[100] requires recusal whenever a judge's partiality might reasonably be questioned, ***even if the judge does not have actual personal bias or prejudice***.[101] The judge's failure to recuse herself in such circumstances would constitute an abuse of discretion.[102]

50.     The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases.[103] As Congress recognized when enacting section 455, litigants "ought

---

[98] *Id.*

[99] *Republic of Panama v. Am. Tobacco Co.*, 217 F.3d 343, 346 (5th Cir. 2000).

[100] *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R.Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6354–55); *Liljeberg*, 486 U.S. at 859–60.

[101] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 n. 8 (1988); *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).

[102] *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999).

[103] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *see also Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877

21

not have to face a judge where there is a reasonable question of impartiality."[104] This neutrality requirement helps guarantee that no person will be deprived of his interests in the absence of a proceeding in which the arbiter is not predisposed to find against him.[105] As a result, the Fifth Circuit has held that "*[i]f the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal.*"[106]

51. *First*, the Bankruptcy Court's Order ignored most of the grounds in the Motion, which itself further demonstrates the Bankruptcy Court's predisposition to rule against Appellants without objective analysis. The evidence in the Motion shows that the Bankruptcy Court's actions reveal such a high degree of antagonism toward Appellants (and favoritism toward any party adverse to Appellants) to make fair judgment impossible, including:

    (a)    repeated negative statements about Mr. Dondero;

    (b)    admission that its negative opinions about Mr. Dondero could not be excised from the Court's mind;

    (c)    repeated reference to proceedings in the Acis Bankruptcy to justify findings made in the Highland Bankruptcy that were not otherwise supported by the Highland record;

    (d)    indication that it was predisposed to disregard the presumption of corporate formalities and conclude, without supporting evidence, that any entity the Bankruptcy Court considered affiliated with Mr. Dondero (*i.e.*, including the highly regulated Affected Entities, which are governed by independent boards) was essentially Mr. Dondero's alter ego;[107] and

    (e)    repeatedly disregarding, without basis, of the testimony of any witness with a connection to Mr. Dondero as *per se* not credible, including testimony of attorneys and persons who owe fiduciary duties and ethical obligations.[108]

---

(2009) ("It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process."); see also *Johnson v. Mississippi*, 403 U.S. 212, 216 (1971) (per curiam) ("Trial before 'an unbiased judge' is essential to due process.") (quoting *Bloom v. Illinois*, 391 U.S. 194, 205 (1968)).

[104] H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6351, 6355.

[105] *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (internal citations omitted).

[106] *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997) (emphasis added).

[107] R. 3371, the February 8, 2021 Transcript at 13:17-24 (R. 3383); 20:18-20 (R. 3390); 21:18-22:3 (R. 3391-3392).

[108] *See, e.g.*, ECF 1943 at p. 19 ("At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not

22

The failure to address any of these grounds in the Order is further evidence of the root issue.

52.      **Second**, the Bankruptcy Court, in the Order, appears to be distancing itself from its prior admissions regarding the Acis Bankruptcy, which raises an issue regarding the source of the "extrajudicial knowledge" supporting the Bankruptcy Court's bias against Mr. Dondero. In its Order, the Bankruptcy Court contends that: (a) it does not recall any specific ruling from the *Acis* case relating to Mr. Dondero;[109] (b) it only recalls Mr. Dondero testifying once in court during the *Acis* case;[110] and (c) it has vague recollection that deposition testimony may have been presented another time.[111] Nevertheless, on February 19, 2020, approximately two months after the Highland Bankruptcy was transferred **and before Mr. Dondero had ever testified in the Highland Bankruptcy**, the Bankruptcy Court prefaced a statement in a hearing with the phrase, **"[i]f you can trust Mr. Dondero… ."**[112]

53.      If the Court does not recall anything from the Acis Bankruptcy, then this statement could only be based on extrajudicial knowledge. As a result, the Bankruptcy Court's statements in the Order have created a fact issue over the source of its knowledge to support its expressed doubt as to anyone's ability to "trust" Mr. Dondero.

54.      **Third**, even a lack of extrajudicial knowledge is not fatal because Appellants are entitled to a full and fair opportunity to make their case in an impartial forum—regardless of their history

---

convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero."); *see also*, R. 3166, **t**he January 8, 2021 Transcript, at 175:8-176:25 (R. 3340-3341).

[109] R. 31, Order at p. 8 (R. 38).
[110] *Id.* at p.9 (R. 39).
[111] *Id.*
[112] R. 2610, the February 19, 2020 Transcript, at 174:22-175:1 (emphasis added) (R. 2783-2784).

**App. 48**

with that forum.[113] The Supreme Court has recognized that predispositions developed during the course of a trial can create a valid basis for a bias or partiality motion.[114] While the presence of an extrajudicial source is *a* factor in favor of finding recusal under section 455,[115] it is **not necessary** for recusal.[116] Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, will support recusal under section 455(a) "*if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible*."[117]

55.     As stated above, the Bankruptcy Court has admitted a predisposition against Mr. Dondero and made repeated statements and took actions (including doubting the credibility of any witness connected to Mr. Dondero; ignoring evidence in the record, *e.g.*, evidence of corporate formalities; and disregarding the required presumption that Mr. Dondero's filings by his counsel are made in good-faith) demonstrating that the Bankruptcy Court is not capable of ruling impartially where Mr. Dondero is concerned. Additionally, as described herein (e.g., paragraphs 11, 16-17 and 27-28 above), the Bankruptcy Court has two different standards for Appellants and anyone adverse to Appellants, showing a high degree of favoritism.

56.     Importantly, even after the Bankruptcy Court denied the Motion, the Bankruptcy Court's antagonism toward Appellants and favoritism toward any party adverse to Appellants continued.[118] For example, at a hearing on June 10, 2021 after Appellants moved to withdraw the reference, the Bankruptcy Court *sue sponte* recommended Debtor file fraudulent transfer claims

---

[113] *Miller v. Sam Houston State University,* 986 F.3d 880, 893 (5th Cir. 2021) (citing *United States v. Jordan,* 49 F.3d 152, 155 (5th Cir. 1995)).
[114] *Liteky v. United States*, 510 U.S. 540, 554 (1994) (emphasis added).
[115] *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citations omitted).
[116] *Liteky v. United States*, 510 U.S. 540, 554-55 (1994).
[117] *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citation omitted) (emphasis added).
[118] Appellants have moved to supplement the record, which is unopposed and pending before the court. The supplemental documents will demonstrate ongoing bias.

24

**App. 49**

(suggesting that those might affect the reference from being withdrawn).[119]

57.     At that same hearing, the Bankruptcy Court refused to grant Dugaboy's motion to compel Debtor to file the "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or debtor . . . in which the estate holds a substantial or controlling interest" as required by Fed. R. Bankr. P. 2015.3(a).[120] The Court raised concerns that the statutorily required information might be used to "cobble together a new adversary alleging mismanagement" against the Debtor[121] and did not grant the motion because, among other things, it would be unduly burdensome.[122]

58.     Then, just seven days later, on June 17, 2021, the Bankruptcy Court entered a *sua sponte* order claiming to question Appellants' standing to as creditors to object to various settlements and the handling of the estate (the "June 17 Order").[123] The June 17 Order requires Appellants (and other entities with ties to Mr. Dondero) to "file a Notice in this case disclosing: (1) who owns the entity (showing percentages); (2) whether Mr. Dondero or the Trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage; (3) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity; and (4) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims)."[124] Importantly, the June 17 Order actually establishes Appellants' standing and

---

[119] June 10, 2021 Transcript at 81:5-16 (App. 81); 83:1-12 (App. 83), a true and correct copy of which is attached to Appellants' Appendix as Tab 1 (App. 1-91).
[120] *Id*. at 49:12-14 (App. 49).
[121] *Id*. at 46:11-13 (App. 46).
[122] *Id.* at 49:12-51:3 (App. 49).
[123] *See* June 17 Order at p. 1 (App. 92), a true and copy of which is attached to Appellants' Appendix as Tab 2 (App. 92-104) ("This Order is issued by the court sua sponte pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case. More specifically, the Order is directed at clarifying the party-in-interest status or standing of numerous parties who are regularly filing pleadings in the above-referenced 20-month-old Chapter 11 bankruptcy case.").
[124] *Id* at p. 12-13 (App. 103-104).

unjustifiably requires action that have nothing to do with standing.

## C. Recusal was and remains proper.

59.     Here, the Bankruptcy Court seeks to sit as both judge and jury in various pending and future Adversary Proceedings and contested matters and has demonstrated a willingness to retain jurisdiction whenever possible.[125] To do so, the Bankruptcy Court must, but appears unable to, set aside any prejudice or bias against Appellants in those proceedings. A reasonable person, knowing the facts, would doubt the Bankruptcy Court's impartiality regarding Appellants. At a minimum, that is the perception that has been created.[126] The Bankruptcy Court cannot escape this reality by subjectively concluding, without analysis, that it does not believe the allegations in the Motion to be true. As a result, the Bankruptcy Court abused its discretion in denying the Motion.

## IV.    CONCLUSION AND PRAYER

FOR THE FOREGOING REASONS, Appellants respectfully request that the Court reverse the Bankruptcy Court's order denying Appellants' Motion to Recuse; order that the Bankruptcy Court is recused from the Adversary Proceedings and any future contested matters involving Appellants or any entity connected to Mr. Dondero; and grant Appellants all other further relief, at law or equity, to which they are justly entitled.

---

[125] *See, e.g.,* R. 3480, the September 23, 2020 Transcript, at 50:4-52:7 (R. 3529-3530).
[126] *Liteky v. United States*, 510 U.S. 540, 551 (1994).

26

**App. 51**

## CERTIFICATE OF COMPLIANCE

In compliance with Rules 8014 and 8015, I hereby certify that:

(a) This document complies with the type-volume limit of FED. R. BANKR. P. 8015(a)(7)(B) because, excluding the parts of the document exempted by FED. R. BANKR. P. 8015(g), this document contains 9,285 words.

(b) This document complies with the typeface requirements of FED. R. BANKR. P. 8015(a)(5) and the type-style requirements of FED. R. BANKR. P. 8015(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft word, version 2008, in size 12, Times New Roman.

Dated: June 28, 2021

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
***Counsel for Appellants***

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 28, 2021, a true and correct copy of the above and foregoing document was served on all parties of record via the Court's e-filing system.

*/s/ Michael J. Lang*
Michael J. Lang

**App. 52**

# Exhibit 4

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                   )   Case No. 19-34054-sgj-11
In Re:                             )
                                   )
HIGHLAND CAPITAL                   )   Dallas, Texas
MANAGEMENT, L.P.,                  )   February 19, 2020
                                   )   9:30 a.m.
          Debtor.                  )
                                   )   MOTIONS
_____  )

                        TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:              Greg Demo
                             John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Debtor:              Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd., 13th
                               Floor
                             Los Angeles, CA  90067
                             (310) 277-6910

For the Debtor:              Melissa S. Hayward
                             Zachery Z. Annable
                             HAYWARD & ASSOCIATES, PLLC
                             10501 N. Central Expressway,
                               Suite 106
                             Dallas, TX  75231
                             (972) 755-7104

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539
```

**App. 54**

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee    Juliana Hoffman
     of Unsecured Creditors:       SIDLEY AUSTIN, LLP
 3                                 2021 McKinney Avenue, Suite 2000
                                   Dallas, TX  75201
 4                                 (214) 981-3413

 5   For Acis Capital             Rakhee V. Patel
     Management GP, LLC,          Annmarie Antoinette Chiarello
 6   et al.:                      Phillip L. Lamberson
                                  WINSTEAD, P.C.
 7                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 8                                (214) 745-5250

 9   For Acis Capital             Brian Patrick Shaw
     Management GP, LLC,          ROGGE DUNN GROUP, P.C.
10   et al.:                      500 N. Akard Street, Suite 1900
                                  Dallas, TX  75201
11                                (214) 239-2707

12   For the Issuer Group:        Amy K. Anderson
                                  JONES WALKER, LLP
13                                811 Main Street, Suite 2900
                                  Houston, TX  77002
14                                (713) 437-1866

15   For the Issuer Group:        James T. Bentley
     (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
16                                919 Third Avenue
                                  New York, NY  10022
17                                (212) 756-2000

18   For Redeemer Committee of    Mark A. Platt
     the Highland Crusader        FROST BROWN TODD, LLC
19   Fund:                        100 Crescent Court, Suite 350
                                  Dallas, TX  75201
20                                (214) 580-5852

21   For Redeemer Committee of    Marc B. Hankin
     the Highland Crusader        JENNER & BLOCK, LLP
22   Fund:                        919 Third Avenue
     (Telephonic)                 New York, NY  10022-3098
23                                (212) 891-1600

24

25
```

```
 1   APPEARANCES, cont'd.:

 2   For the U.S. Trustee:          Lisa L. Lambert
                                    OFFICE OF THE UNITED STATES
 3                                    TRUSTEE
                                    1100 Commerce Street, Room 976
 4                                  Dallas, TX  75242
                                    (214) 767-8967 Ext. 1080
 5
     Recorded by:                   Michael F. Edmond
 6                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
 7                                  Dallas, TX  75242
                                    (214) 753-2062
 8
     Transcribed by:                Kathy Rehling
 9                                  311 Paradise Cove
                                    Shady Shores, TX  76208
10                                  (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
```

**App. 56**

1    Second, Foley is not being retained to conduct the

2 Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3 Again, nobody has objected on that basis.

4    Third, Foley represented the Debtor prior to the petition

5 date on these matters.  Again, nobody has objected on that

6 basis.

7    And, fourth, you know, as Judge Nelms will testify, the

8 retention of Foley and Foley's continued prosecution of the

9 Acis matters is in the best interest of the Debtor's estate.

10    And then fifth and finally, Foley has no adverse interest

11 with respect to the matters on which it is being retained.

12    Now, as I mentioned, there were two omnibus objections

13 that were filed.  There was the Committee's objection and then

14 there was Acis's objection.  Both of these objections really

15 had one common theme, which was that there was insufficient

16 disclosure as to how the fees were going to be allocated, and,

17 honestly, whether or not Mr. James Dondero would benefit from

18 Foley's retention without paying his share of those fees.

19    Now, we had a meeting with the Committee on Friday and we

20 walked through this issue.  And as a result of that, the

21 Committee withdrew its objection.

22    What we told to the Committee is that, prior to the Acis

23 bankruptcy -- and this goes primarily to the retention -- or,

24 the prosecution of the involuntary petition appeal.  In that

25 appeal, Foley is representing just Neutra.  Foley is not

**App. 57**

1    representing the Debtor.  Now, the economic benefit to the

2    estate, though, in that appeal accrues almost solely to the

3    Debtor.  It does not accrue to Neutra or to Neutra's economic

4    interest owners, which, full disclosure, are Mr. James Dondero

5    and Mr. Mark Okada.

6        The reason why the Debtor -- and you'll hear, again, hear

7    this from Judge Nelms -- believes that it's in the economic

8    best interest of its estate to pay for Neutra's fees in that

9    appeal is that, if Neutra is successful in that appeal, the

10   involuntary petition obviously will be struck, the involuntary

11   will be unwound, and the economic interest and the economic

12   ownership of Acis will revert to Neutra.

13       Upon that reversion, Highland Capital Management will be

14   reinstated as the advisor to Neutra.

15       Now, if Neutra -- I'm sorry, if Acis then generates fees,

16   those fees are going to be paid about 85 percent to satisfy

17   the contractual obligations under that advisory agreement.

18       So, on a go-forward basis, again, if Neutra is successful,

19   85 percent of the revenue generated by Acis will go to Neutra.

20   That remaining 15 percent will be used to satisfy the claim

21   that Acis -- I'm sorry, that Highland Capital Management has

22   against Acis for the pre-, post-petition, and gap period

23   services that it provided to Acis under the advisory

24   agreements.  That claim is about $8 million.

25       So, 85 percent of the revenue on a go-forward basis is

1  Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2  mean, I apologize, withdrawn.  That, plus the DAF matter, are

3  two examples where the Board exercised its judgment not to

4  pursue pending litigation; is that fair?

5  A    That's correct.

6  Q    Okay.  Is the Board supportive of the Debtor's application

7  to retain Foley for the three matters you have described?

8  A    It is.

9  Q    And without revealing privileged communications, can you

10  describe generally the diligence that the Board conducted to

11  reach that decision?

12  A    Well, we met with some of the people that work at

13  Highland.  We met with the Debtor's attorneys, the Pachulski

14  firm.  We did have a couple of meetings with Ms. Patel and Mr.

15  Terry.  Some of us have reviewed the pleadings, some more than

16  others.  And, well, we may have done other things, but those

17  are the ones that come to mind right now.

18  Q    I don't know if you mentioned it, but did you confer with

19  Ms. O'Neil?

20  A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21  Q    Okay.  And what was the purpose of the diligence that you

22  just described for the Court?

23  A    Well, ultimately, what we as a board were trying to do was

24  to conduct kind of a cost-benefit analysis to the estate:  How

25  much will this potentially cost us?  What's the potential

1    receiving a benefit from this, the Committee has standing to

2    pursue that.

3         So it's not a null set, Your Honor, whereas cutting off

4    the appeal now does take away that possibility.

5              THE COURT:  How would I be cutting off the appeal?

6    I'm not cutting off the appeal.  King & Spalding can go in

7    there and fight hard.  Foley can go in there and fight hard

8    for Neutra.  So, --

9              MR. DEMO:  One second, Your Honor.

10        (Counsel confer.)

11             MR. DEMO:  And I guess, you know, Your Honor, and I

12   do want to reiterate that there is no other party with an

13   economic incentive to fight the Neutra appeal the way that the

14   Debtor has an economic incentive.

15             THE COURT:  That makes no sense to me.  HCLOF is the

16   one who hated this injunction.

17             MR. DEMO:  That's not the Neutra appeal, Your Honor.

18   That's the confirmation order.

19             THE COURT:  Well, okay.  Neutra gets its company back

20   if they win.

21             MR. DEMO:  And we would get our contracts back.

22             THE COURT:  And arguably, it can control Acis, maybe,

23   okay, and it can assign management contracts to whoever it

24   wants.  That just -- and it says it'll assign them to

25   Highland.  If you can trust Jim Dondero, then Highland's going

**App. 60**

1   to benefit if Neutra wins that appeal.  Right?

2            MR. DEMO:  Yes.  Yes, Your Honor.

3            THE COURT:  Okay.  So that --

4            MR. DEMO:  Highland would benefit greatly --

5            THE COURT:  Okay.

6            MR. DEMO:  -- if Neutra were to win that appeal.

7            THE COURT:  Okay.  Okay.  Well, but first Neutra

8   benefits, right?  And then --

9            MR. DEMO:  No.

10           THE COURT:  -- Highland only secondarily benefits --

11           MR. DEMO:  I -- I --

12           THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14           MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17           THE COURT:  Okay.

18           MR. DEMO:  So, worst case, --

19           THE COURT:  It would have been nice to have him

20   testify as to all of this.

21           MR. DEMO:  Worst --

22           THE COURT:  It would be more compelling if I had him.

23           MR. DEMO:  Well, --

24           THE COURT:  Okay?  But I don't think --

25           MR. DEMO:  -- I can only do so much, Your Honor.

1   you know, I hate it that we were here, but I understand it.

2        But I'm concerned.  I'm concerned -- well, here's the

3   deal.  We have a great board, and I totally get that

4   Bankruptcy Courts should defer heavily to the reasonable

5   exercise of business judgment by a board.  And we've got great

6   professionals.  And we've got this case, I think, on a good

7   track as a general matter now.  But I'm concerned that Dondero

8   or certain in-house counsel has -- you know, they're smart,

9   they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero.  That's what I believe.

15       I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios.  If this is reversed, here

18  is how it will play out.  If this is reversed, here is how it

19  might play out.  And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed.  Economic benefit to Neutra:  Yeah,

23  maybe.  Economic benefit to HCLOF:  Well, they'll get what

24  they want.  You know, whether it's an economic benefit, I

25  don't know.  But benefit to Highland?  I just don't think the

1  evidence has been there to convince me it's reasonable

2  business judgment for Highland to pay the legal fees

3  associated with the appeal.

4      And even more concerning to me is a valid point was made

5  that Highland is in bankruptcy because of litigation,

6  litigation, litigation.  The past officers and directors and

7  controls' propensity to fight about everything.  This isn't a

8  balance sheet restructuring, okay?  It's not a Chapter 11

9  caused by operational problems or revenue disruption or who

10  knows what kind of disruption.  It's about years of litigation

11  finally coming home to roost.  And this just appears to be

12  more of the same, potentially.

13      Okay.  Parties have a right to appeal.  I respect that.

14  Neutra, go for it.  HCLOF, go for it.  But this estate and its

15  creditors should not bear the burden of having Highland pay

16  for that, when, again, I don't think there's any evidence to

17  suggest they could benefit at the end of the day.

18      So what I'm going to do is I'm going to approve the

19  retention of Foley to represent Highland in the Acis case.  We

20  all know the adversary is stayed right now.  It may or may not

21  ever be un-stayed, depending on what strategies people want to

22  pursue.  But Highland, I think a meritorious case has been

23  presented, and under 327(e) I will approve Foley representing

24  Highland in all Acis matters.  Okay?  The Acis bankruptcy

25  case.  The adversary proceeding, if it goes forward.  And so

**App. 63**

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24 _____     _____
   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

**App. 64**

# Exhibit 5

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
                             DALLAS DIVISION

                                 )    Case No. 19-34054-sgj-11
In Re:                           )    Chapter 11
                                 )
HIGHLAND CAPITAL                 )    Dallas, Texas
MANAGEMENT, L.P.,                )    Friday, January 8, 2021
                                 )    9:30 a.m. Docket
          Debtor.                )
                                 )
HIGHLAND CAPITAL                 )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                )
                                 )
          Plaintiff,             )    PRELIMINARY INJUNCTION
                                 )    HEARING [#2]
v.                               )
                                 )
JAMES D. DONDERO,                )
                                 )
          Defendant.             )
                                 )
```

```
                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
```

WEBEX/TELEPHONIC APPEARANCES:

```
For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                              13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Debtor/Plaintiff:   John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700
```

**App. 66**

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero,        D. Michael Lynn
     Defendant:               John Y. Bonds, III
 3                            Bryan C. Assink
                              BONDS ELLIS EPPICH SCHAFER
 4                              JONES, LLP
                              420 Throckmorton Street,
 5                              Suite 1000
                              Fort Worth, TX  76102
 6                            (817) 405-6900

 7   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
 8                            One South Dearborn Street
                              Chicago, IL  60603
 9                            (312) 853-7539

10   For the Funds and        Davor Rukavina
     Advisors:                MUNSCH HARDT KOPF & HARR, P.C.
11                            500 N. Akard Street, Suite 3800
                              Dallas, TX  75201-6659
12                            (214) 855-7554

13   For Certain Employees:   Frances A. Smith
                              ROSS & SMITH, P.C.
14                            Plaza of the Americas
                              700 N. Pearl Street, Suite 1610
15                            Dallas, TX  75201
                              (214) 593-4976
16
     Recorded by:             Michael F. Edmond, Sr.
17                            UNITED STATES BANKRUPTCY COURT
                              1100 Commerce Street, 12th Floor
18                            Dallas, TX  75242
                              (214) 753-2062
19
     Transcribed by:          Kathy Rehling
20                            311 Paradise Cove
                              Shady Shores, TX  76208
21                            (972) 786-3063

22

23

24

          Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

**App. 67**

1   action and it was destroyed to keep us from having that

2   evidence.

3      And they brought forth all kinds of case law.  It's a hard

4   area.  It's a really, really hard area.  But I ended up --

5   again, it's not in the main opinion.  It was in subsequent

6   orders.  I ended up saying, yeah, I think you've met the

7   standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9   deliver today.  But the destruction of the phone is my biggest

10  takeaway of concern today, how that might have ramifications.

11  You know, there are other bad things, too, about that.  I'm

12  not even going to go there right now.  But the, you know,

13  Title 18, you can ask your lawyer what that means, but okay.

14     My second big takeaway before we get to the hopeful stuff

15  is -- and this is kind of harsh, what I'm about to say -- but

16  Ellington and Leventon maybe care more about you, Mr. Dondero,

17  than their law license.  You know, I guess it's great to have

18  people in your life who are very, very loyal to you.  I mean,

19  loyalty is a wonderful thing.  But I am just so worried about

20  things I've heard.  Again, the phone and in-house lawyers.

21  The biggest concerns in my brains right now.  I have worried

22  about them for a while.

23     You all will -- well, Mr. Dondero, you might not know

24  this.  But we had a hearing a few months ago, maybe September,

25  October, where the Creditors' Committee was trying to get

1  discovery of documents.  And we had some sort of hearing,

2  maybe a motion to compel production.  And we had many, many

3  entities that you control file objections:  NexPoint, NexBank.

4  I can't even remember.  We just had a whole slew.  CLO Holdco.

5  Many, many of these entities objected.  And I was trying to

6  figure out that day who was instructing them.  And oh my

7  goodness, I hope the in-house layers are not involved in this

8  document discovery dispute, because, you know, they have

9  fiduciary duties.  And are -- you know, is it -- it feels like

10 it's breaching a duty to the bankruptcy estate when it's in

11 the bankruptcy estate's best interest to get these documents

12 if you're meanwhile hiring lawyers for these other entities,

13 Holdco, et cetera, and saying, Fight this.

14      I never really pressed it very hard back then, but I

15 raised the issue and I said, I'm really, really concerned

16 about this.  And I continue to be concerned about it.  I had

17 experiences with Mr. Ellington in the *Acis* case where he

18 testified on the witness stand, and later it looked a heck of

19 a lot like he might have committed perjury.  I hate to use

20 such blunt terms.  But I let it go.  I'm just like, you know,

21 I'm not going to -- you know, I'm going to just hope for the

22 best that he misspoke.

23      But I'm getting a really bad taste in my mouth about

24 Ellington and Leventon, and I hope that they will be careful

25 and you will be careful, Mr. Dondero, in future actions.

**App. 69**

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 4:09 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                    CERTIFICATE

19      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
20  above-entitled matter.

21   **/s/ Kathy Rehling**                      **01/11/2021**

22  _____     _____

23  Kathy Rehling, CETD-444                        Date
   Certified Electronic Court Transcriber

24

25

# Exhibit 6

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
2
                                )    Case No. 19-34054-sgj-11
3    In Re:                      )    Chapter 11
                                )
4    HIGHLAND CAPITAL            )    Dallas, Texas
     MANAGEMENT, L.P.,           )    Monday, February 8, 2021
5                                )    9:00 a.m. Docket
              Debtor.            )
6                                )    BENCH RULING ON CONFIRMATION
                                )    HEARING [1808] AND AGREED
7                                )    MOTION TO ASSUME [1624]
     _____)
8
                        TRANSCRIPT OF PROCEEDINGS
9              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
10
     WEBEX APPEARANCES:
11
     For the Debtor:             Jeffrey Nathan Pomerantz
12                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
13                                13th Floor
                                 Los Angeles, CA  90067-4003
14                               (310) 277-6910

15   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
16                               One South Dearborn Street
                                 Chicago, IL  60603
17                               (312) 853-7539

18   For James Dondero:          D. Michael Lynn
                                 John Y. Bonds, III
19                               Bryan C. Assink
                                 BONDS ELLIS EPPICH SCHAFER
20                                JONES, LLP
                                 420 Throckmorton Street,
21                                Suite 1000
                                 Fort Worth, TX  76102
22                               (817) 405-6900

23   For Get Good Trust and      Douglas S. Draper
     Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
24                               650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
25                               (504) 299-3300
```

2

```
1    APPEARANCES, cont'd.:

2    For Certain Funds and        Davor Rukavina
     Advisors:                    MUNSCH, HARDT, KOPF & HARR
3                                 500 N. Akard Street, Suite 3800
                                  Dallas, TX  75201-6659
4                                 (214) 855-7587

5    For Certain Funds and        A. Lee Hogewood, III
     Advisors:                    K&L GATES, LLP
6                                 4350 Lassiter at North Hills
                                    Avenue, Suite 300
7                                 Raleigh, NC  27609
                                  (919) 743-7306
8
     Recorded by:                 Michael F. Edmond, Sr.
9                                 UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
10                                Dallas, TX  75242
                                  (214) 753-2062
11
     Transcribed by:              Kathy Rehling
12                                311 Paradise Cove
                                  Shady Shores, TX  76208
13                                (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24

25              Proceedings recorded by electronic sound recording;
                  transcript produced by transcription service.
```

**App. 73**

1   least $37.4 million" relating to alleged breached employment-

2   related agreements and for the tort of defamation arising from

3   a 2017 press release posted by the Debtor.

4       The Debtor and Patrick Daugherty recently announced a

5   settlement of the Patrick Daugherty claim in the amount of

6   $750,000 cash on the effective date, an $8.25 million general

7   unsecured claim, and a $2.75 million subordinated claim.

8   Other aspects and details of this settlement are being

9   omitted.

10      Additionally, an entity known as HarbourVest, who invested

11  more than $70 million with an entity in the Highland complex,

12  asserted a $300 million proof of claim against Highland,

13  alleging, among other things, fraud and RICO violations.  The

14  HarbourVest claim was settled during the bankruptcy case for a

15  $45 million general unsecured claim and a $35 million junior

16  claim.

17      Other than these claims just described, most of the other

18  claims in this case are claims asserted against the Debtor by

19  other entities in the Highland complex, most of which entities

20  the Court finds to be controlled by Mr. Dondero; claims of

21  employees who believe that they are entitled to large bonuses

22  or other types of deferred compensation; and claims of

23  numerous law firms that did work for Highland and were unpaid

24  for amounts due to them on the petition date.

25      Yet another reason this is not your garden-variety Chapter

**App. 74**

1   that the Debtor filed shortly before the confirmation hearing

2   that, among other things, show the estimated distribution to

3   creditors and compare plan treatment to a likely disbursement

4   in a Chapter 7.

5        These do not constitute a materially adverse change to the

6   treatment of any creditors or interest holders.  They merely

7   update likely distributions based on claims that have now been

8   settled, and they've otherwise incorporated more recent

9   financial data.  This happens often before confirmation

10  hearings.  The Court finds that it did not mislead or

11  prejudice any creditors or interest holders, and certainly

12  there was no need to resolicit the Plan.

13       The only Objectors to the Plan left at this time were Mr.

14  Dondero and entities that the Court finds are controlled by

15  him.  The standing of these entities to object to the Plan

16  exists, but the remoteness of their economic interest is

17  noteworthy, and the Court questions the good faith of the

18  Objectors.  In fact, the Court has good reason to believe that

19  these parties are not objecting to protect economic interests

20  they have in the Debtor, but to be disruptors.

21       Mr. Dondero wants his company back.  This is

22  understandable.  But it's not a good faith basis to lob

23  objections to the Plan.  The Court has slowed down

24  confirmation multiple times on the current Plan and urged the

25  parties to talk to Mr. Dondero.  The parties represent that

**App. 75**

1    they have, and the Court believes that they have.

2         Now, to be specific about the remoteness of the objectors'

3    interests, the Court will address them each separately.

4    First, Mr. Dondero has a pending objection.  Mr. Dondero's

5    only economic interest with regard to the Debtor at this point

6    is an unliquidated indemnification claim.  And based on

7    everything this Court has heard, his indemnification claim

8    will be highly questionable at this juncture.

9         Second, a joint objection has been filed by the Dugaboy

10   Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11   was created to manage the assets of Mr. Dondero and his

12   family, and it owns a 0.1866 percent limited partnership

13   interest in the Debtor.  The Court is not clear what economic

14   interest the Get Good Trust has, but it likewise seems to be

15   related to Mr. Dondero, and it has been represented to the

16   Court numerous times that the trustee is Mr. Dondero's college

17   roommate.

18        Another group of Objectors that has joined together in one

19   objection is what the Court will refer to as the Highland and

20   NexPoint Advisors and Funds.  The Court understands they

21   assert disputed administrative expense claims against the

22   estate.  While the evidence presented was that they have

23   independent board members that run these companies, the Court

24   was not convinced of their independence from Mr. Dondero.

25   None of the so-called independent board members of these

1  entities have ever testified before the Court.  Moreover, they

2  have all been engaged with the Highland complex for many

3  years.

4       The witness who testified on these Objectors' behalves at

5  confirmation, Mr. Jason Post, their chief compliance officer,

6  resigned from Highland after more than twelve years in October

7  2020, at the same time that Mr. Dondero resigned or was

8  terminated by Highland.  And a prior witness recently for

9  these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12       Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims.  Mr.

14  Dondero appears to be in control of these entities as well.

15       To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith.  Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22       In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence.  Around the

**App. 77**

1    under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2    under the Bankruptcy Code, a bankruptcy court can issue any

3    order, including a civil contempt order, necessary or

4    appropriate to carry out the provisions of the Code, citing,

5    of course, 105 of the Bankruptcy Code.

6        The Fifth Circuit stated that, when considering whether to

7    enjoin future filings against a vexatious litigant, a

8    bankruptcy court must consider the circumstances of the case,

9    including four factors:  (1)  the party's history of

10   litigation; in particular, whether he has filed vexatious,

11   harassing, or duplicative lawsuits; (2) whether the party had

12   a good faith basis for pursuing the litigation, or perhaps

13   intended to harass; (3) the extent of the burden on the courts

14   and other parties resulting from the party's filings; and (4)

15   the adequacy of alternatives.

16       In the *Baum* case, the Fifth Circuit stated that the

17   traditional standards for injunctive relief -- *i.e.*,

18   irreparable harm and inadequate remedy at law -- do not apply

19   to the issuance of an injunction against a vexatious litigant.

20       Here, although I have not been asked to declare Mr.

21   Dondero and his affiliated entities as vexatious litigants *per*

22   *se*, it is certainly not beyond the pale to find that his long

23   history with regard to the major creditors in this case has

24   strayed into that possible realm, and thus this Court is

25   justified in approving this provision.

**App. 78**

1    to win, I turned it off.

2        I'm sorry.  That's terrible.  You know, my law clerk, my

3    law clerk that you can't see, Nate, he is from Ann Arbor,

4    Michigan, University of Michigan, and he almost cried when I

5    said I didn't like Tom Brady the other day.  So, I apologize.

6        MR. POMERANTZ:  Your Honor, one other comment.  We

7    had our motion to assume our nonresidential real property

8    lease that was also on.  It got missed in all the fanfare, but

9    it was -- it has been unopposed and essentially done pursuant

10   to stipulation.  So we'd like to submit an order on that as

11   well.

12       THE COURT:  Okay.  I have seen that, and I approve it

13   under 365.  You may submit the order.  Okay.  Thank you.

14       MR. POMERANTZ:  Thank you, Your Honor.

15       THE CLERK:  All rise.

16       (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                          **02/09/2021**

24   _____          _____

25   Kathy Rehling, CETD-444                          Date
     Certified Electronic Court Transcriber

**App. 79**

# Exhibit 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Thursday, June 10, 2021 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) MOTION TO COMPEL COMPLIANCE |
| | ) WITH BANKRUPTCY RULE 2015.3 |
| | ) FILED BY GET GOOD TRUST AND |
| | ) THE DUGABOY INVESTMENT TRUST |
| | ) (2256) |
| _____ | ) |
| | ) |
| HIGHLAND CAPITAL | ) **Adversary Proceeding 21-3006-sgj** |
| MANAGEMENT, L.P., | ) |
| | ) |
| Plaintiff, | ) DEFENDANT'S MOTION FOR LEAVE |
| | ) TO FILE AMENDED ANSWER AND |
| v. | ) BRIEF IN SUPPORT [15] |
| | ) |
| HIGHLAND CAPITAL | ) |
| MANAGEMENT SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| HIGHLAND CAPITAL | ) **Adversary Proceeding 21-3007-sgj** |
| MANAGEMENT, L.P., | ) |
| | ) |
| Plaintiff, | ) DEFENDANT'S MOTION FOR LEAVE |
| TO | ) TO AMEND ANSWER TO PLAINTIFF'S |
| v. | ) COMPLAINT [16] |
| | ) |
| HCRE PARTNERS, LLC | ) |
| N/K/A NEXPOINT REAL | ) |
| ESTATE PARTNERS, LLC, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

**App. 81**

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust      Douglas S. Draper
     and Dugaboy Investment      HELLER, DRAPER & HORN, LLC
 3   Trust:                      650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
 4                               (504) 299-3300

 5   For the Debtor:            Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
 6                               10100 Santa Monica Blvd.,
                                   13th Floor
 7                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
 8
     For the Debtor:            John A. Morris
 9                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
10                               New York, NY  10017-2024
                                 (212) 561-7700
11
     For the Official Committee  Matthew A. Clemente
12   of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
13                               Chicago, IL  60603
                                 (312) 853-7539
14
     For James Dondero:         Clay M. Taylor
15                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
16                               420 Throckmorton Street,
                                   Suite 1000
17                               Fort Worth, TX  76102
                                 (817) 405-6900
18
     For the NexPoint           Lauren K. Drawhorn
19   Parties:                    WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
20                               Dallas, TX  75204
                                 (214) 692-6200
21
     Recorded by:               Michael F. Edmond, Sr.
22                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
23                               Dallas, TX  75242
                                 (214) 753-2062
24

25
```

**App. 82**

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24              transcript produced by transcription service.

25

**App. 83**

 1   cost, $70 million of notes get forgiven?  How is that

 2   possible?  How is that possible?  It doesn't pass the good

 3   faith test.  The Court should deny the motion.

 4        Thank you, Your Honor.

 5             THE COURT:  Mr. Morris, in all of your listing of

 6   allegedly problematic things, one trail my brain was going

 7   down is this:  Is this adversary going to morph even further

 8   to add fraudulent transfer allegations?  I mean, if notes --

 9             MR. MORRIS:  Here's the --

10             THE COURT:  -- were forgiven or agreements were made

11   --

12             MR. MORRIS:  Yeah, I --

13             THE COURT:  -- that they would be forgiven if, you

14   know, assets are sold at a dollar more than cost, is the

15   Debtor going to say, well, okay, if this is an agreement,

16   there was a fraudulent transfer?

17             MR. MORRIS:  Your Honor, that is an excellent

18   question, one which I was discussing with my partners just

19   this morning.  You know, we have to -- we're balancing a

20   number of things on our side, including the delay that that

21   might entail; including, you know, what happens if we go down

22   that path.  You know, the benefit of suing under the notes, of

23   course, is that he's contractually obligated to pay all of our

24   fees.

25        And so we're balancing all of those things as these -- as

**App. 84**

1          THE COURT:  Well, one of the reasons I'm asking is I

2     would not set the motion to withdraw the reference status

3     conference on an expedited basis, which I was asked to do a

4     few days ago in these two adversary proceedings, and I can't

5     remember when I've set it, but now I'm even worried, if I

6     grant this motion, is it going to be premature to have that

7     status conference in a month or so, whenever I've set it,

8     because if I grant this motion I'm wondering, am I going to

9     have your motion to amend to add fraudulent transfer claims?

10    It's -- you know, I want to give as complete a package to the

11    District Court as I can whenever I have that motion to

12    withdraw the reference.

13         All right.  Ms. Drawhorn, back to you.  As I said --

14              MS. DRAWHORN:  Yes.

15              THE COURT:  -- before inviting Mr. Morris to make his

16    argument, I know the law is very much on your clients' favor

17    as far as the law construing Rule 15(a).  But my goodness, I'm

18    wondering if your client needs -- your client needs to be

19    careful what they're asking for here, after what I've just

20    heard.

21         Anyway, what -- you get the last word on this.

22              MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23    response is that Mr. Morris's argument was all on the merits

24    of the defenses, and certainly he is free to argue on the

25    merits, but that's not a determination for today and that's

1          THE COURT:  Please upload an order, Ms. Drawhorn,

2    granting your motion with these specific requirements that

3    I've orally worked in.

4       I think clients need to be careful what they ask for.  I'm

5    very concerned.  And I know it was just argument and I'll hear

6    evidence, but of all of the things that I guess -- well, I'm

7    concerned about a lot of things, but do we have audited

8    financial statements that didn't disclose these agreements

9    with regard to --

10          MR. MORRIS:  Yes, Your Honor.

11          THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15          THE CLERK:  All rise.

16       (Proceedings concluded at 11:58 a.m.)

17                          --oOo--

18

19                        CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        06/12/2021

23   _____        _____

     Kathy Rehling, CETD-444                        Date
24   Certified Electronic Court Transcriber

25

**App. 86**

# Exhibit 8

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | ~~21-3003~~ |
| | § | |
| JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| ~~Defendant.~~ Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**App. 88**

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT, AND (II) TURNOVER OF PROPERTY OF THE DEBTOR'S ESTATE, (III) FRAUDULENT TRANSFER, AND (IV) BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding"), by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendant, Mr. defendants James Dondero ("Mr. Dondero" or "Defendant"), Nancy Dondero, and The Dugaboy Investment Trust ("Dugaboy," and together with Mr. Dondero and Nancy Dondero, "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1.  The Debtor brings this action against Mr. Dondero as a result of Defendants in connection with Mr. Dondero's defaults under three promissory notes executed by Mr. Dondero in favor of the Debtor in the aggregate original principal amount of $8,825,000, and payable upon the Debtor's demand.  Despite due demand, Mr. Dondero has failed to pay amounts due and owing under the notes and the accrued but unpaid interest thereon.

2.  After amending his answer and his sworn responses to interrogatories, Mr. Dondero now contends that the Debtor orally agreed to relieve him of his obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  Mr. Dondero further contends that he entered into the Alleged Agreement with his sister, Nancy Dondero, as trustee of Dugaboy, acting on behalf of the Debtor.  At the time Mr. Dondero entered into the Alleged Agreement, he controlled the Debtor and was the lifetime beneficiary of Dugaboy.

**App. 89**

3.    Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the notes.

4.    Nevertheless, the Debtor amends its Complaint for the purpose of adding certain claims and naming additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable.   Specifically, in addition to pursuing claims against Mr. Dondero for breach of his obligations under the notes and for turnover, the Debtor adds alternative claims (a) against Mr. Dondero for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5.    2. Through this ComplaintAs remedies, the Debtor seeks (a) damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under the Notes (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the notes), for Mr. Dondero's breach of his obligations under the Notes, and (b) turnover by Mr. Dondero to the Debtor of the foregoing amounts.; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, Mr. Dondero pursuant to the Notes; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

DOCS_NY:41770.743594.1 36027/002

**App. 90**

## JURISDICTION AND VENUE

6. ~~3.~~ This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7. ~~4.~~ The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8. ~~5.~~ This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9. ~~6.~~ Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10. ~~7.~~ The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11. ~~8.~~ Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled the Debtor.

12. Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

13. Upon information and belief, Nancy Dondero is Mr. Dondero's sister, and the trustee of Dugaboy.

4

DOCS_NY:~~41770.7~~43594.1 36027/002

**App. 91**

**CASE BACKGROUND**

14. ~~9.~~ On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15. ~~10.~~ On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) ~~the Defendants,~~ Acis ~~LP~~Capital Management, L.P. and Acis ~~GP~~Capital Management GP LLC (collectively, "Acis").

16. On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

17. ~~11.~~ On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

18. ~~12.~~ The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

**STATEMENT OF FACTS**

A.   **The Dondero Notes**

19. ~~13.~~ Mr. Dondero, in his personal capacity, is the maker under a series of promissory notes in favor of the Debtor.

---
[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:~~41770.7~~43594.1 36027/002

**App. 92**

20.   ~~14.~~ Specifically, on February 2, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $3,825,000 ("Dondero's First Note").  A true and correct copy of Dondero's First Note is attached hereto as **Exhibit 1**.

21.   ~~15.~~ On August 1, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Second Note").  A true and correct copy of Dondero's Second Note is attached hereto as **Exhibit 2.**

22.   ~~16.~~ On August 13, 2018, Mr. Dondero executed a promissory note in favor of the Debtor, as payee, in the original principal amount of $2,500,000 ("Dondero's Third Note" and collectively, with Dondero's First Note and Dondero's Second Note, the "Notes").  A true and correct copy of Dondero Third Note is attached hereto as **Exhibit 3.**

23.   ~~17.~~ Section 2 of each Note provides: "**Payment of Principal and Interest**. The accrued interest and principal of this Note shall be due and payable on demand of the Payee."

24.   ~~18.~~ Section 4 of each Note provides:

**Acceleration Upon Default**.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

25.   ~~19.~~ Section 6 of each Note provides:

**Attorneys' Fees**.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

DOCS_NY:~~41770.7~~43594.1 36027/002

**App. 93**

B.     **Mr. Dondero Defaults Under Each Note**

26.     20. By letter dated December 3, 2020, the Debtor made demand on Mr.

Dondero for payment under the Notes by December 11, 2020 (the "Demand Letter").  A true and

correct copy of the Demand Letter is attached hereto as **Exhibit 4**.  The Demand Letter provided:

> By this letter, Payee is demanding payment of the accrued interest and
> principal due and payable on the Notes in the aggregate amount of
> $9,004,013.07, which represents all accrued interest and principal through
> and including December 11, 2020.
>
> **Payment is due on December 11, 2020, and failure to make payment in
> full on such date will constitute an event of default under the Notes.**

Demand Letter (emphasis in the original).

27.     21. Despite the Debtor's demand, Mr. Dondero did not pay all or any

portion of the amounts demanded by the Debtor on December 11, 2020, or at any time thereafter.

28.     22. As of December 11, 2020, there was an outstanding principal amount

of $3,687,269.71 on Dondero's First Note and accrued but unpaid interest in the amount of

$21,003.70, resulting in a total outstanding amount as of that date of $3,708,273.41.

29.     23. As of December 11, 2020, there was an outstanding principal balance

of $2,619,929.42 on Dondero's Second Note and accrued but unpaid interest in the amount of

$27,950.70, resulting in a total outstanding amount as of that date of $2,647,880.12.

30.     24. As of December 11, 2020, there was an outstanding principal balance

of $2,622,425.61 on Dondero's Third Note and accrued but unpaid interest in the amount of

$25,433.94, resulting in a total outstanding amount as of that date of $2,647,859.55.

31.     25. Thus, as of December 11, 2020, the total outstanding principal and

accrued but unpaid interest due under the Notes was $9,004,013.07.

32.     26. Pursuant to Section 4 of each Note, each Note is in default, and is

currently due and payable.

**App. 94**

**C.      The Debtor Files the Original Complaint**

      33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for Mr. Dondero's breach of his obligations under the Notes and (ii) turnover by Mr. Dondero for the outstanding amounts under the Notes, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

**D.      Mr. Dondero's Affirmative Defenses**

      34.    On March 16, 2021, Mr. Dondero filed his *Original Answer* [Docket No. 6] (the "Original Answer").  In his Original Answer, Mr. Dondero asserted four affirmative defenses: (i) the Debtor's claims should be barred because it was previously agreed by the Debtor that the Debtor would not collect on the Notes, (ii) waiver, (iii) estoppel, and (iv) failure of consideration. *See id.* ¶¶ 40-43.

      35.    On April 6, 2021, Mr. Dondero filed his *Amended Answer* [Docket No. 16] (the "Amended Answer"), asserting three additional affirmative defenses: (i) the Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶ 40, (ii) The Debtor's claims are barred, in whole or in part, due to setoff, *id.* ¶ 41, and (iii) the Notes are "ambiguous," *id.* ¶ 45.

      36.    According to Mr. Dondero, the Alleged Agreement was orally entered into in January or February 2019, and was not memorialized in any documentation.

      37.    According to Mr. Dondero, he entered into the Alleged Agreement with his sister, Nancy Dondero, acting in her capacity as the Trustee of Dugaboy, which purportedly held the majority of the Debtor's Class A limited partnership interests.

8

**App. 95**

38.     Mr. Dondero controlled the Debtor at the time he entered into the Alleged Agreement.

39.     Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

40.     According to Mr. Dondero, he discussed the Alleged Agreement with Nancy Dondero, but (a) no one else participated in the discussions surrounding the execution or authorization of the Alleged Agreement, and (b) the Alleged Agreement was not subject to any negotiation.

41.     Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.      Dugaboy Lacked Authority to Act on Behalf of the Debtor**

42.     Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 5**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

43.     Section 4.2(b) of the Limited Partnership Agreement states:

Management of Business.   No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 5**, § 4.2(b).

44.     No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

9

**App. 96**

45.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor.

## FIRST CLAIM FOR RELIEF

**(Against Mr. Dondero)**
**(~~For~~ Breach of Contract)**

46.     ~~27.~~ The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

47.     ~~28.~~ Each Note is a binding and enforceable contract.

48.     ~~29.~~ Mr. Dondero breached each Note by failing to pay all amounts due to the Debtor upon the Debtor's demand.

49.     ~~30.~~ Pursuant to each Note, the Debtor is entitled to damages from Mr. Dondero in an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

50.     ~~31.~~ As a direct and proximate cause of Mr. Dondero's breach of each Note, the Debtor has suffered damages in the total amount of at least $9,004,013.07, as of December 11, 2020, plus an amount equal to all accrued but unpaid interest from that date plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF

**(Against Mr. Dondero)**

**(Turnover ~~by Mr. Dondero~~ Pursuant to 11 U.S.C. § 542(b))**

51.     ~~32.~~ The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.   33. Mr. Dondero owes the Debtor an amount equal to (i) the aggregate outstanding principal due under each Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Mr. Dondero's breach of his obligations under each of the Notes.

53.   34. Each Note is property of the Debtor's estate and the amounts due under each Note is matured and payable upon demand.

54.   35. Mr. Dondero has not paid the amounts dues under each Note to the Debtor.

55.   36. The Debtor has made demand for the turnover of the amounts due under each Note.

56.   37. As of the date of filing of this Complaint, Mr. Dondero has not turned over to the Debtor all or any of the amounts due under each of the Notes.

57.   38. The Debtor is entitled to the turnover of all amounts due under each of the Notes.

**THIRD CLAIM FOR RELIEF**

**(Against Mr. Dondero)**

**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

58.   The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

59.   The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement within two years of the Petition Date.

60.    Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a)    The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(b)    Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(c)    Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

(d)    The Debtor's books and record do not reflect the Alleged Agreement.

(e)    The Alleged Agreement was not subject to negotiation.

(f)    The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

61.    The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt Mr. Dondero incurred under the Notes demonstrates a scheme of fraud.

62.    Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

63.    Accordingly, the Debtor is entitled to a judgement: (i) avoiding Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FOURTH CLAIM FOR RELIEF**

**(Against Mr. Dondero)**

**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

64.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

65.     The Debtor made the transfers in the aggregate amount of $8,825,000 in exchange for the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

66.     Mr. Dondero entered into the Alleged Agreement with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfers were made to, or for the benefit of, Mr. Dondero, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfers was not reasonably equivalent in value.

13

**App. 100**

67.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from Mr. Dondero.

68.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfers thereunder, and (ii) recovering from Mr. Dondero the amount of $8,825,000.

**FIFTH CLAIM FOR RELIEF**

**(Against Dugaboy)**

**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

69.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

70.     A bona fide, actual, present dispute exists between the Debtor and Dugaboy concerning whether Dugaboy was authorized to entered into the Alleged Agreement on the Debtor's behalf.

71.     A judgment declaring the parties' respective rights and obligations will resolve their dispute..

72.     Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

14

**App. 101**

- (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) Dugaboy otherwise had no right  or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF

### (Against Dugaboy)

### (Breach of Fiduciary Duty)

73.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

74.     If Dugaboy, as a limited partner, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy would owe the Debtor a fiduciary duty.

75.     If Dugaboy had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy breached its fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

76.     Accordingly, the Debtor is entitled to recover from Dugaboy (a) actual damages that the Debtor suffered as a result of its breach of fiduciary duty, and (b) for punitive and exemplary damages.

### SEVENTH CLAIM FOR RELIEF

### (Against James Dondero and Nancy Dondero)

### (Aiding and Abetting a Breach of Fiduciary Duty)

77.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

DOCS_NY:41770.743594.1 36027/002

**App. 102**

78.     James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

79.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

80.     The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

81.     Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages.

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by Mr. Dondero to the Debtor of an amount equal to  (a) the aggregate outstanding principal due under each Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

DOCS_NY:41770.743594.1 36027/002

**App. 103**

(iii)  On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section 548 of the Bankruptcy Code;

(iv)  On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder and recovering from Mr. Dondero the amount of $8,825,000 pursuant to section Tex. Bus. & C. Code § 24.005(a)(1);

(v)  On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) Dugaboy was not authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) Dugaboy otherwise had no right or authority to enter into the Alleged Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)  On its Sixth Claim for Relief, actual damages from Dugaboy, in an amount to be determined at trial, that Debtor suffered as a result of Dugaboy's breach of fiduciary duty, and for punitive and exemplary damages;

(vii)  On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages; and

17

**App. 104**

Such other and further relief as this Court deems just and proper.

18

DOCS_NY:41770.743594.1 36027/002

**App. 105**

Dated:  ~~January 18,~~July___, ~~2020~~2021  PACHULSKI STANG ZIEHL & JONES LLP
             Jeffrey N. Pomerantz (CA Bar No.143717)
             Ira D. Kharasch (CA Bar No. 109084)
             John A. Morris (NY Bar No. 2405397)
             Gregory V. Demo (NY Bar No. 5371992)
             Hayley R. Winograd (NY Bar No. 5612569)
             10100 Santa Monica Blvd., 13th Floor
             Los Angeles, CA 90067
             Telephone: (310) 277-6910
             Facsimile: (310) 201-0760
             E-mail:  jpomerantz@pszjlaw.com
                  ikharasch@pszjlaw.com
                  jmorris@pszjlaw.com
                  gdemo@pszjlaw.com
                  hwinograd@pszjlaw.com

             -and-

             */s/*_____
             HAYWARD PLLC
             Melissa S. Hayward
             Texas Bar No. 24044908
             MHayward@HaywardFirm.com
             Zachery Z. Annable
             Texas Bar No. 24053075
             ZAnnable@HaywardFirm.com
             10501 N. Central Expy, Ste. 106
             Dallas, Texas 75231
             Tel: (972) 755-7100
             Fax: (972) 755-7110

             *Counsel for Highland Capital Management, L.P.*

19

**App. 106**

1

**App. 107**

Document comparison by Workshare 9.5 on Tuesday, July 13, 2021 8:45:45 AM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/41770/7 |
| Description | DOCS_NY-#41770-v7-HCM_Demand_Notes_-_Dondero_Amended_Complaint |
| Document 2 ID | PowerDocs://DOCS_NY/43594/1 |
| Description | DOCS_NY-#43594-v1-Amended_Complaint_(Notes_Litigation) |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 226 |
| Deletions | 58 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 284 |

# Exhibit 9



**South Texas**
COLLEGE OF LAW
— HOUSTON —
PRIVATE AND INDEPENDENT
SINCE 1923.

May 28, 2021

Michael Aigen, Esq.
Stinson LLP
3102 Oak Lawn Avenue
Suite 777
Dallas, TX 75219

Re:    Cause No. 19-34054-SGJ-11, Adversary No. 21-03003, *Highland Capital Management,
       L.P. v. James D. Dondero*, in the United States Bankruptcy Court for the Northern
       District of Texas, Dallas Division

Dear Mr. Aigen:

In response to your request, I am writing to provide my views on whether loans made by
Highland Capital Management, L.P. (Highland Capital) to your client, James Dondero, were
properly structured to have the potential to be deferred compensation such that they would not
have caused Mr. Dondero to have income for federal income tax purposes when the loans were
made but rather only when and if forgiven. I understand that this issue has arisen in the adversary
proceeding brought by Highland Capital against Mr. Dondero in the matter referenced above.

As discussed in more detail below, I conclude that the loans between Highland Capital and Mr.
Dondero would not have caused Mr. Dondero to have income from the discharge of indebtedness
for federal income tax purposes when made, or even when the conditions for forgiveness were
agreed upon, but rather only when and if the loans are actually forgiven.

**Documents Reviewed**

For purposes of preparing this report, I reviewed the following documents, which you provided
to me:

1. The complaint filed by Highland Capital in the adversary proceeding referenced above.
2. The amended answer filed by Mr. Dondero in the adversary proceeding referenced above.
3. The promissory note dated February 2, 2018, signed by Mr. Dondero in which he
   promised to pay to Highland Capital $3,825,000.
4. The promissory note dated August 1, 2018, signed by Mr. Dondero in which he promised
   to pay to Highland Capital $2,500,000.
5. The promissory note dated August 13, 2018, signed by Mr. Dondero in which he
   promised to pay to Highland Capital $2,500,000.

**Qualifications**

I am a Professor of Law at South Texas College of Law Houston, where I have been a member
of the faculty since 1997. Prior to joining the faculty at South Texas, I was a visiting professor
for one year in the Graduate Tax Program at the University of Florida Levin College of Law. I

Michael Aigen, Esq.
Stinson, LLP
May 28, 2021
Page 2

have also held a visiting appointment at Loyola University Chicago School of Law. Over the last twenty-four years I have taught a wide variety of tax courses and have written extensively in the area of federal taxation. I regularly give presentations on federal taxation at conferences around the country.

Prior to teaching, I was an associate at the law firm of Covington & Burling in Washington, DC, for five years, where I practiced in the area of federal taxation.

My curriculum vitae, which lists all of my publications, is attached as an appendix.

**Previous Experience as an Expert Witness**

I have been designated as an expert in the following four cases. I have testified by deposition in the first matter and testified both by deposition and at trial in the second matter. I have not testified by deposition or at trial in the third or fourth matter:

1. Cause No. 2014-10394A, *Lion Polymers, LLC v. Lion Copolymer Holdings LLC*, in the 190th Judicial District Court, Harris County, Texas.
2. Cause No. D-1-GN-19-007155, *Conagra Brands, Inc. v. Glenn Hegar, Comptroller of Public Accounts*, in the 345th Judicial District Court, Travis County, Texas.
3. Cause No. D-1-GN-18-004006, *Equistar Chemicals, LP v. Glenn Hegar, Comptroller of Public Accounts*, in the 126th Judicial District Court, Travis County, Texas.
4. Cause No. D-1-GN-20-002649, *Hibernia Energy, LLC v. Glenn Hegar, Comptroller of Public Accounts*, in the 261st Judicial District Court, Travis County, Texas.

**Compensation**

I am being compensated for my work in this matter at the following rates: $150 per hour for travel time; $250 per hour for research, consulting with counsel, or providing any work related to this report; and $350 per hour for testimony by deposition or at trial.

**Assumed Facts**

You have asked me to assume the following facts:

1. Mr. Dondero signed the three promissory notes mentioned earlier (the Notes), which are payable to Highland Capital upon the demand of Highland Capital.
2. Subsequent to Mr. Dondero's execution of the Notes, but before Highland Capital made demand for payment of the Notes, Highland Capital and Mr. Dondero entered into an oral agreement (the Subsequent Agreement).
3. In the Subsequent Agreement between Highland Capital and Mr. Dondero, Highland Capital agreed that it would not collect on the Notes unless certain conditions (the Conditions) could not be satisfied. In other words, Highland Capital agreed that the loans will be forgiven only if the Conditions are satisfied.
4. Whether the Conditions are satisfied was not and is not within Mr. Dondero's control because they included the condition that certain portfolio company assets be sold above cost or in a manner outside Mr. Dondero's control.
5. The Conditions have not yet been satisfied.

Michael Aigen, Esq.
Stinson, LLP
May 28, 2021
Page 3

## Analysis

When a person receives funds and has an obligation to repay them, as in the case of a typical loan, the obligation to repay prevents the person from having income for federal income tax purposes as a result of receiving the funds. *See, e.g.*, *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983) ("When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer.")

If a borrower's obligation to repay is subsequently reduced or eliminated, then the borrower has income from the discharge of indebtedness. The loan proceeds are not retroactively included in the borrower's income in the year the borrower received the loan proceeds; instead, the borrower has income from the discharge of indebtedness in the year in which (and to the extent to which) the borrower's obligation to repay is reduced or eliminated. This is reflected in Internal Revenue Code (IRC) § 61(a)(11), which provides that a taxpayer's gross income includes "income from the discharge of indebtedness."

In this case, the proceeds of the loans represented by the Notes were not includible in the income of Mr. Dondero for federal income tax purposes. This is because, as reflected in the Notes, Mr. Dondero had an obligation to repay these loan proceeds.

When Mr. Dondero and Highland Capital entered into the Subsequent Agreement, Mr. Dondero again did not have income from the discharge of indebtedness. This is because Mr. Dondero's obligation to repay remained in effect. Pursuant to the Subsequent Agreement, Highland Capital agreed to cancel the loans represented by the Notes only if and when the Conditions are satisfied. Whether the Conditions are satisfied is not within Mr. Dondero's control.

The issue presented by the Subsequent Agreement is analogous to the issue considered by the U.S. Supreme Court in *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990). In that case, the Court considered whether a utility company had to include in gross income deposits it required from customers with bad credit to assure prompt payment of future bills. The Court concluded that the amounts in question were not included in the income of the utility. In reaching this conclusion, the Court stated:

> [T]hese deposits were acquired subject to an express "obligation to repay," either at the time service was terminated or at the time a customer established good credit. So long as the customer fulfills his legal obligation to make timely payments, his deposit ultimately is to be refunded, and both the timing and method of that refund are largely within the control of the customer.
>
> …
>
> … The key is whether the taxpayer has some guarantee that he will be allowed to keep the money. IPL's receipt of these deposits was accompanied by no such guarantee.

*Id.* at 209-10. In the same way, Mr. Dondero had an obligation to repay the loan proceeds represented by the Notes, and his obligation to repay remained in effect after the Subsequent Agreement. In the Subsequent Agreement, Highland Capital agreed to cancel the debts

**App. 112**

Michael Aigen, Esq.
Stinson, LLP
May 28, 2021
Page 4

represented by the Notes in the future only if and when the Conditions are satisfied. In other words, Highland Capital's agreement to cancel the debts represented by the Notes is conditional, and Mr. Dondero has no guarantee that he will be allowed to keep the loan proceeds in question.

In summary: (1) the proceeds of the loans represented by the Notes were not includible in the income of Mr. Dondero for federal income tax purposes because Mr. Dondero had an obligation to repay them, and (2) the Subsequent Agreement in which Highland Capital agreed to cancel the debts represented by the Notes if and when the Conditions are satisfied did not cause Mr. Dondero to have income from the discharge of indebtedness because Highland Capital's agreement to cancel the debts was conditional and did not eliminate Mr. Dondero's obligation to repay the loan proceeds.

Sincerely,

Bruce A. McGovern
Professor of Law and Director, Tax Clinic

**App. 113**

# APPENDIX

# BRUCE A. McGOVERN

---

## EDUCATION

**University of Florida Levin College of Law**                     Gainesville, FL
- LL.M. (Taxation), 1996.

**Fordham University School of Law**                     New York, NY
- J.D. *cum laude*, 1989.
- Managing Editor, *Fordham Law Review*.

**Columbia University, Columbia College**                     New York, NY
- B.A. (Religion), 1984.

**New School for Social Research**                     New York, NY
- Freshman Year Program, 1980-1981

## EXPERIENCE

**South Texas College of Law Houston**                     Houston, TX
*Professor of Law*, August 2003–present
*Director, Low-Income Taxpayer Clinic*, August 2016-present
*Vice President and Associate Dean of Academic Administration*, 2007-2017
*Associate Professor of Law*, April 2000–August 2003
*Assistant Professor of Law*, August 1997–April 2000
- Teach and write in the areas of federal taxation and business organizations.
- Courses: Agency & Partnership, Corporations, Corporate Taxation, Federal Income Taxation, Federal Tax Procedure, Partnership & Subchapter S Taxation, U.S. Taxation of International Transactions.
- As Associate Dean of Academic Administration:
  - Served as a member of the College's senior administration. Duties included general oversight, establishing policies, and strategic planning.
  - Oversaw areas of Admissions, Career Resources and Financial Aid. Responsible for administering annually more than $2.5 million in scholarships and grants and more than $30 million in student loans.

**McGovern Tax Services, LLC**                     Katy, TX
*Co-Managing Member*, September 2017-present
- Prepare individual federal and state income tax returns and provide tax consulting services.

**Loyola University Chicago School of Law**                     Chicago, IL
*Visiting Professor*, January 2006-May 2006
- Courses:  International Taxation and Corporate & Partnership Taxation.

**University of Florida Levin College of Law**                     Gainesville, FL
*Visiting Assistant Professor of Law*, August 1996–August 1997
- Taught courses in both the Graduate Tax Program and the J.D. curriculum.
- Courses:  Federal Income Taxation and Legal Accounting (both in the J.D. curriculum) and Federal Tax Research and Advanced Corporate Taxation (both in the Graduate Tax Program).

*C.V. of Bruce A. McGovern*
Page 2

## EXPERIENCE (CONTINUED)

**Professor Daniel J. Lathrope**                    Gainesville, FL
*Graduate Assistant*, August 1995–July 1996
- Prepared draft chapter on tax treatment of affiliated corporations (e.g., section 482 and consolidated tax returns) for new edition of widely used casebook on corporate taxation. Provided comments and revisions for other chapters.

**Covington & Burling**                    Washington, DC
*Associate (Tax),* October 1990–August 1995
- Provided advice to clients on a wide range of federal tax issues, including advice related to litigation settlements and environmental cleanups, corporate reorganizations, compliance with tax accounting rules, and the taxation of life insurance companies and products.
- Duties included providing transactional advice, commenting on proposed Treasury regulations, seeking IRS private letter rulings and technical advice, and negotiating settlements in IRS administrative appeals.

**The Hon. Thomas J. Meskill, U.S. Court of Appeals, Second Circuit**
*Judicial Clerk,* August 1989–August 1990

## PUBLICATIONS

**Books:**

Federal Income Taxation of Individuals (3d ed. Thomson Reuters 2003 and Supp. 2021) (with Boris I. Bittker, Martin J. McMahon, Jr., and Lawrence A. Zelenak)

Agency, Partnerships and Limited Liability Companies (2d ed. Carolina Academic Press 2013) (with Gary S. Rosin and Michael L. Closen)

**Book Chapters:**

Chapters in Consolidated Groups, CCH Tax Research Consultant (electronic treatise) (Chicago, IL: Commerce Clearing House, Tax Research Network, 2006):

- Overview of Consolidated Returns
- Factors to Consider in Determining Whether Eligible Corporations Should File a Consolidated Return
- Eligibility to File a Consolidated Return
- Election to File a Consolidated Return
- Electing to Discontinue Filing a Consolidated Return
- Tax Years, Methods of Accounting, and Related Issues
- Estimated Tax Payments
- Tentative Carryback Adjustments

**Articles:**

*Recent Developments in Federal Income Taxation: The Year 2020,* 74 The Tax Lawyer ___ (2021) (with Cassady V. Brewer and James M. Delaney) (forthcoming).

*Recent Developments in Federal Income Taxation: The Year 2019,* 73 The Tax Lawyer 501 (2020) (with Cassady V. Brewer and James M. Delaney).

*Recent Developments in Federal Income Taxation: The Year 2018,* 72 The Tax Lawyer 695 (2019) (with Cassady V. Brewer).

*C.V. of Bruce A. McGovern*
*Page 3*

**Articles** *(cont'd)*:

*Recent Developments in Federal Income Taxation: The Year 2017,* 71 The Tax Lawyer 725 (2018) (with Cassady V. Brewer).

*Recent Developments in Federal Income Taxation: The Year 2016,* 20 Florida Tax Rev. 131 (2017) (with Martin J. McMahon, Jr.).

*Recent Developments in Federal Income Taxation: The Year 2015,* 18 Florida Tax Rev. 275 (2016) (with Martin J. McMahon, Jr.)

*Recent Developments in Federal Income Taxation: The Year 2014,* 17 Florida Tax Rev. 97 (2015) (with Martin J. McMahon, Jr. and Ira B. Shepard).

*Liabilities of the Firm, Member Guaranties, and the At Risk Rules: Some Practical and Policy Considerations,* 7 J. Small & Emerging Bus. L. 63 (2003) (now Lewis & Clark L. Rev.).

*Fiduciary Duties, Consolidated Returns, and Fairness,* 81 Neb. L. Rev. 170 (2002).

*An Obituary of the Federal Estate Tax,* 43 Ariz. L. Rev. 625 (2001) (with M.C. Mirow).

*The New Provision for Tolling the Limitations Periods for Seeking Tax Refunds: Its History, Operation and Policy, and Suggestions for Reform,* 65 Mo. L. Rev. 797 (2000).

*Tax Aspects of Environmental Liabilities and Insurance Recoveries,* 7 Mealey's Litigation Reports (Insurance) No. 23, at 21 (Apr. 20, 1993) (with William M. Paul).

## PRESENTATIONS

**Recent Developments in Federal Income Taxation** (selected presentations)

- Oregon Tax Institute, Jun. 2021 (virtual presentation with Cassady V. Brewer and James M. Delaney).
- Virginia Conference on Federal Taxation, Jun. 2021 (virtual presentation with Cassady V. Brewer and James M. Delaney).
- Houston IRS-CPA Society, May 2021 (virtual presentation).
- Univ. of North Carolina Tax Institute, Apr. 2021 (virtual presentation with Cassady V. Brewer).
- Florida Tax Institute, Feb. 2021 (virtual presentation with Cassady V. Brewer).
- State Bar of Texas, Tax Law in a Day, Feb. 2021 (virtual presentation).
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas, Dec. 2020 (webcast panel presentation).
- Oklahoma Tax Institute, Dec. 2020 (virtual presentation).
- Tennessee Federal Tax Conference, Nov. 2020 (virtual presentation).
- Tulane Tax Institute, Nov. 2020 (virtual presentation).
- Montana Tax Institute, Oct. 2020 (virtual presentation with James M. Delaney).
- Oregon Tax Institute, Sept. 2020 (virtual presentation with Cassady V. Brewer and James M. Delaney).
- State Bar of New Mexico Tax Symposium, Sept. 2020 (virtual presentation).
- Houston Bar Association Section of Taxation, Sept. 2020 (virtual presentation).
- State Bar of Texas, Tax Law 2020, Aug. 2020 (virtual presentation).
- Texas Society of CPAs Tax Summit, Aug. 2020 (virtual presentation).
- Virginia Conference on Federal Taxation, Jun. 2020 (virtual presentation with Cassady V. Brewer and James M. Delaney).
- Houston IRS-CPA Society, Apr. 2020 (virtual presentation).
- Dallas Bar Association Section of Taxation, Dallas, Texas, Mar. 2020.
- Florida Tax Institute, Tampa, Florida, Feb. 2020.

PRESENTATIONS (CONT'D)

**Recent Developments in Federal Income Taxation** (selected presentations)
- State Bar of Texas, Tax Law in a Day, Houston, Texas, Feb. 2020.
- ABA Section of Taxation Midyear Meeting, Boca Raton, Florida, Feb. 2020 (with Elaine Gagliardi and James M. Delaney).
- Houston Tax Roundtable, Houston, Texas, Jan. 2020.
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas, Dec. 2019 (webcast panel presentation).
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2019.
- Tulane Tax Institute, New Orleans, Louisiana, Nov. 2019.
- Texas Society of CPAs Tax Institute, Dallas and San Antonio, Texas, Nov. 2019.
- Kansas Society of CPAs Tax Institute, Wichita, Kansas, Nov. 2019.
- Austin CPA Chapter Annual Tax Conference, Austin, Texas, Nov. 2019.
- Montana Tax Institute, Missoula, Montana, Oct. 2019.
- Southern Federal Tax Institute, Atlanta, Georgia, Oct. 2019 (with Cassady V. Brewer).
- State Bar of New Mexico Tax Symposium, Albuquerque, NM, Sept. 2019.
- State Bar of Texas, Annual Meeting, Austin, Texas, Jun. 2019 (with Cassady V. Brewer).
- Oregon Tax Institute, Portland, Oregon, Jun. 2019.
- Virginia Conference on Federal Taxation, Charlottesville, Virginia, Jun. 2019).
- Tax Alliance Conference, Plano, Texas, Jun. 2019.
- Univ. of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2019 (with Cassady V. Brewer).
- Houston IRS-CPA Society, Houston, Texas, Apr. 2019.
- Dallas Bar Association Section of Taxation, Dallas, Texas, Apr. 2019.
- Houston Bar Association Section of Taxation, Houston, Texas, Mar. 2019.
- Florida Tax Institute, Tampa, Florida, Feb. 2019 (with Cassady V. Brewer).
- State Bar of Texas, Tax Law in a Day, Dallas, Texas, Jan. 2019.
- ABA Section of Taxation Midyear Meeting, New Orleans, Louisiana, Jan. 2019 (with Elaine Gagliardi and Philip Hackney).
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas, Dec. 2018 (webcast panel presentation).
- Oklahoma Tax Institute, Oklahoma City, Oklahoma, Nov. 2018.
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2018 (with Cassady V. Brewer).
- University of Texas Tax Conference, Austin, Texas, Nov. 2018.
- Austin CPA Chapter Annual Tax Conference, Austin, Texas, Nov. 2018.
- Capital of Texas Enrolled Agents Seminar, Austin, Texas, Nov. 2018.
- Tulane Tax Institute, New Orleans, Louisiana, Nov. 2018.
- Southern Federal Tax Institute, Atlanta, Georgia, Oct. 2018 (with Cassady V. Brewer).
- Montana Tax Institute, Missoula, Montana, Oct. 2018 (with Cassady V. Brewer)
- State Bar of New Mexico Tax Symposium, Albuquerque, NM, Sept. 2018.
- State Bar of Texas Advanced Tax Law Course, Dallas, Texas, Aug. 2018.
- Oregon Tax Institute, Portland, Oregon, Jun. 2018.

*C.V. of Bruce A. McGovern*
*Page 5*

PRESENTATIONS (CONTINUED)

**Recent Developments in Federal Income Taxation** (selected presentations)

- Virginia Conference on Federal Taxation, Charlottesville, Virginia, Jun. 2018 (with Cassady V. Brewer).
- Tax Alliance Conference, Plano, Texas, Jun. 2018.
- Dallas Bar Association Section of Taxation, Dallas, Texas, April 2018.
- Univ. of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2018 (with Cassady V. Brewer).
- Houston IRS-CPA Society, Houston, Texas, Apr. 2018.
- Florida Tax Institute, Tampa, Florida, Feb. 2018 (with Cassady V. Brewer).
- Houston Bar Association Section of Taxation, Houston, Texas, Feb. 2018.
- ABA Section of Taxation Midyear Meeting, San Diego, California, Feb. 2018 (with Cassady V. Brewer and Elaine Gagliardi).
- State Bar of Texas, Tax Law in a Day, Houston, Texas, Feb. 2017.
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas, Dec. 2017 (webcast panel presentation).
- Oklahoma Tax Institute, Tulsa, Oklahoma, Dec. 2017.
- University of Texas Tax Conference, Austin, Texas, Dec. 2017.
- Austin Tax Study Group, Austin, Texas, Dec. 2017
- ABA Section of Taxation Low Income Taxpayer Representation Workshop, Washington, DC, Dec. 2017 (with Eric Benson and The Hon. Peter J. Panuthos)
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2017 (with Cassady V. Brewer).
- Texas Society of CPAs Tax Institute, Richardson, Texas, Nov. 2017.
- Tulane Tax Institute, New Orleans, Louisiana, Nov. 2017.
- Austin CPA Chapter Annual Tax Conference, Austin, Texas, Nov. 2017.
- Chattanooga Tax Seminar (Elliot Davis Decosimo), Chattanooga, TN, Nov. 2017.
- Capital of Texas Enrolled Agents Seminar, Austin, Texas, Nov. 2017.
- Montana Tax Institute, Missoula, Montana, Nov. 2017 (with Martin J. McMahon, Jr.)
- Southern Federal Tax Institute, Atlanta, Georgia, Sept. 2017 (with Cassady V. Brewer).
- State Bar of New Mexico Tax Symposium, Albuquerque, NM, Sept. 2017.
- ABA Section of Taxation Fall Meeting, Austin, TX, Sept. 2017 (with Eric Benson, Rochelle Hodes, The Hon. Peter J. Panuthos, and Christine Speidel)
- State Bar of Texas Advanced Tax Law Course, Houston, Texas, Aug. 2017.
- Houston Tax Roundtable, Houston, Texas, Sept. 2017.
- Virginia Conference on Federal Taxation, Charlottesville, Virginia, Jun. 2017.
- Tax Alliance Conference, Plano, Texas, Jun. 2017.
- Oregon Tax Institute, Portland, Oregon, Jun. 2017.
- ABA Section of Taxation May Meeting, Washington, DC, May 2017 (with Kelley Miller and Caleb Smith)
- Univ. of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2017.
- Houston IRS-CPA Society, Houston, Texas, Apr. 2017.
- Dallas Bar Association Section of Taxation, Dallas, Texas, April 2017.
- Florida Tax Institute, Tampa, Florida, Mar. 2017 (with Martin J. McMahon, Jr.).

*C.V. of Bruce A. McGovern*
*Page 6*

## PRESENTATIONS (CONTINUED)

**Recent Developments in Federal Income Taxation** (selected presentations)

- Houston Bar Association Section of Taxation, Houston, Texas, Mar. 2017.
- State Bar of Texas, Tax Law in a Day, Dallas, Texas, Feb. 2017.
- ABA Section of Taxation Midyear Meeting, Orlando, Florida, Jan. 2017 (with Martin J. McMahon, Jr. and Elaine Gagliardi).
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas, Dec. 2016 (webcast panel presentation).
- Oklahoma Tax Institute, Norman, Oklahoma, Dec. 2016.
- University of Texas Tax Conference, Austin, Texas, Dec. 2016.
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2016 (with Martin J. McMahon, Jr.).
- Texas Society of CPAs Tax Institute, Addision & San Antonio, Texas, Nov. 2016.
- Tulane Tax Institute, New Orleans, Louisiana, Nov. 2016.
- Austin CPA Chapter Annual Tax Conference, Austin, Texas, Nov. 2016.
- Chattanooga Tax Seminar (Elliot Davis Decosimo), Chattanooga, TN, Nov. 2016.
- Capital of Texas Enrolled Agents Seminar, Austin, Texas, Nov. 2016.
- State Bar of Texas Advanced Tax Law Course, Austin, Texas, Oct. 2016.
- State Bar of New Mexico Tax Symposium, Albuquerque, NM, Sept. 2016.
- Southern Federal Tax Institute, Atlanta, Georgia, Sept. 2016 (with Martin J. McMahon, Jr.).
- Houston Tax Roundtable, Houston, Texas, Sept. 2016.
- Texas Association of Certified Public Accountants, Houston, Texas, Aug. 2016.
- Am. Institute on Federal Taxation Conference, Birmingham, Alabama, Jun. 2016.
- Oregon Tax Institute, Portland, Oregon, Jun. 2016.
- Univ. of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2016.
- Houston IRS-CPA Society, Houston, Texas, Apr. 2016.
- Florida Tax Institute, Tampa, Florida, Mar. 2016 (with Martin J. McMahon, Jr.).
- Dallas Bar Association Section of Taxation, Dallas, Texas, Mar. 2016.State Bar of Texas, Tax Law in a Day, Houston, Texas, Feb. 2016.
- ABA Section of Taxation Midyear Meeting, Los Angeles, California, Jan. 2016 (with Martin J. McMahon, Jr. and Elaine Gagliardi).
- Houston Bar Association Section of Taxation, Houston, Texas, Jan. 2016.
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas Dec. 2015 (webcast panel presentation).
- Oklahoma Tax Institute, Tulsa, Oklahoma, Dec. 2015.
- University of Texas Tax Conference, Austin, Texas, Dec. 2015.
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2015 (with Martin J. McMahon, Jr.).
- Austin CPA Chapter Annual Tax Conference, Austin, Texas, Nov. 2015.
- State Bar of Texas Advanced Tax Law Course, Houston, Texas, Oct. 2015.
- Tulane Tax Institute, New Orleans, Louisiana, Oct. 2015.
- Southern Federal Tax Institute, Atlanta, Georgia, Oct. 2015 (with Martin J. McMahon, Jr. and Ira B. Shepard).

*C.V. of Bruce A. McGovern*
*Page 7*

PRESENTATIONS (CONTINUED)

**Recent Developments in Federal Income Taxation** (selected presentations)
- Houston Tax Roundtable, Sept. 2015.
- State Bar of New Mexico Tax Symposium, Albuquerque, New Mexico, Aug. 2015.
- Tax Alliance Conference, Plano, Texas, Jun. 2015.
- Oregon Tax Institute, Portland, Oregon, Jun. 2015.
- Dallas Bar Association Section of Taxation, Dallas, Texas, May 2015.
- University of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2015.
- Florida Tax Institute, Tampa, Florida, Apr. 2015 (with Martin J. McMahon, Jr.).
- Houston IRS-CPA Society, Houston, Texas Apr. 2015.
- Houston Bar Association Section of Taxation, Houston, Texas, Mar. 2015.
- State Bar of Texas, Tax Law in a Day, Dallas, Texas, Feb. 2015.
- ABA Section of Taxation Midyear Meeting, Houston, Texas, Jan. 2015 (with Martin J. McMahon, Jr. and Elaine Gagliardi).
- Texas Society of CPAs Tax Expo, Arlington, Houston, and San Antonio, Dec. 2014.
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas Dec. 2014 (webcast panel presentation).
- University of Texas Tax Conference, Austin, Texas, Dec. 2014 (with Martin J. McMahon, Jr.).
- Tennessee Federal Tax Conference, Franklin, Tennessee, Nov. 2014 (with Martin J. McMahon, Jr.).
- Tulane Tax Institute, New Orleans, Louisiana, Oct. 2014.
- Southern Federal Tax Institute, Atlanta, Georgia, Oct. 2014 (with Martin J. McMahon, Jr. and Ira B. Shepard).
- Houston Tax Roundtable, Sept. 2014 (with Ira B. Shepard).
- State Bar of Texas Advanced Tax Law Course, Dallas, Texas, Aug. 2014.
- Texas Association of Certified Public Accountants, Houston, Texas, Aug. 2014.
- Am. Institute on Federal Taxation Conference, Birmingham, Alabama, Jun. 2014.
- Tax Alliance Conference, Plano, Texas, Jun. 2014 (with Ira B. Shepard).
- Dallas Bar Association Section of Taxation, Dallas, Texas, May 2014.
- University of North Carolina Tax Institute, Chapel Hill, North Carolina, Apr. 2014 (with Martin J. McMahon, Jr.).
- Houston IRS-CPA Society, Houston, Texas Apr. 2014 (with Ira B. Shepard).
- Houston Bar Association Section of Taxation, Houston, Texas, Mar. 2014 (with Ira B. Shepard)
- University of Houston Law Center, Feb. 2014 (with Ira B. Shepard).
- ABA Section of Taxation Midyear Meeting, Phoenix, Arizona, Jan. 2014 (with Martin J. McMahon, Jr. and Elaine Gagliardi).
- Annual Tax Update, Accounting Professionals Continuing Education Network, Dallas, Texas Dec. 2013 (webcast panel presentation).
- Houston Tax Roundtable, Sept. 2013 (with Ira B. Shepard).

**National Webcast, ABA Tax Section**
Houston, TX                                              October 2018
- Topic:  Disaster Resiliency: How Tax Attorneys Can Assist When a Disaster Strikes.

**App. 120**

*C.V. of Bruce A. McGovern*
*Page 8*

## PRESENTATIONS (CONTINUED)

**Houston Bar Association, Section of Taxation**
Houston, TX                                                   November 2011
- Topic:  Recent Developments in Partnership Taxation.

**National Webcast, Accounting Cont'ng Prof. Educ. Network**
Dallas, TX                                                   September 2008
Topic:  The Essential Partnership Tax Update.

**National Webcast, Accounting Cont'ng Prof. Educ. Network**
Dallas, TX                                                   May 2006
Topic:  The Essential Partnership Tax Update.

**Advanced Tax Law Course, State Bar of Texas**
Dallas, TX                                                   September 2005
Topic:  Disguised Sales of Partnership Interests:  The Proposed Regulations.

**Houston Bar Association, Section of Taxation**
Houston, TX                                                   February 2005
Topic:  Disguised Sales of Partnership Interests:  The New Proposed Regulations.

**Southeastern Conference of the Association of American Law Schools**
Hilton Head, SC                                              July 2001
Young Scholars' Workshop:  Fiduciary Duties, Consolidated Returns, and Fairness.

## PROFESSIONAL AFFILIATIONS AND ACTIVITIES

**American College of Tax Counsel**
- Fellow, 2016-present

**State Bar of Texas Tax Section**
- Council Member (Ex Officio) 2014-present
- General Tax Committee, Chair 2017-present, Vice Chair 2014-2017
- Conduct the First Wednesday Tax Update, a monthly webcast for Tax Section members

**Houston Tax Roundtable**
- President, 2015-2016
- Vice-President, 2014-2015
- Member, 2013-present

**Wednesday Tax Forum**
- Member, 2013-present
- Give monthly presentations on recent developments in federal income taxation.

**Houston Tax Procedure Group**
- Co-leader, 2015-present
- Member, 2013-present

**Garland R. Walker Chapter, American Inns of Court.**
- Treasurer, 2015-present
- Treasurer Pro Tem, 2004-2005, 2010-2011
- Member, 2002-present.

**App. 121**

*C.V. of Bruce A. McGovern*
*Page 9*

PROFESSIONAL AFFILIATIONS AND ACTIVITIES (CONT'D)

**Texas Journal of Business Law**
- Faculty Advisor, 2005-2020

**Florida Bar Tax Certification Committee**
- Consultant, 1997-2005

**ABA Sections of Taxation, Business Law, and Legal Education.**
- Member

AWARDS
- Professor of the Year Award, STCL Black Law Students' Association, 1999.
- Outstanding Teaching Award, STCL Student Bar Association, 2000 and 2001.
- Outstanding Programming Award, State Bar of Texas Tax Section, 2018 (for monthly webcast entitled First Wednesday Tax Update)

BAR ADMISSIONS
Connecticut, District of Columbia, Maine, New York.

COMMUNITY INVOLVEMENT
- Member and Usher, St. Martin's Episcopal Church, Houston, Texas
- Assistant Scoutmaster, Boy Scout Troop 209, Katy, Texas, 2015-2018
- Den Leader, Cub Scout Pack 542, Katy, Texas, 2010-2015
- Youth sports coach (basketball and soccer), Katy, Texas, 2010-2016

**App. 122**

# Exhibit 10

STRICTLY CONFIDENTIAL

```
-----------------------------------------------------------x
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
RE: Highland Capital Management, L.P.                      :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
                                                           :
-----------------------------------------------------------x
```

# EXPERT REPORT OF ALAN M. JOHNSON

## MAY 28, 2021

STRICTLY CONFIDENTIAL

# TABLE OF CONTENTS

**Page**

Introduction                                                                                          3

Background                                                                                       4 – 5

Summary of Opinions                                                                          6 – 7

Statement of Opinions                                                                        8 – 15

Conclusion                                                                                           16

Exhibit A:  Work History and Education                                                   17

Exhibit B:  Alan M. Johnson Prior Expert Testimony Since 2016                 18

Exhibit C:  Actual Compensation vs. Estimated Market Compensation Range    19

Exhibit D:  Select Public Peer Comparators                                           20

Exhibit E:  Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)    21 – 23

Exhibit F: Discussions of Investment Management Compensation in the Public Domain    24

Documents Reviewed                                                                            25

Bibliography                                                                                          26

**App. 125**

STRICTLY CONFIDENTIAL

# INTRODUCTION

I have been retained by Stinson LLP ("Stinson"), counsel to Mr. James Dondero, to provide expert opinions based on my knowledge and experience advising asset management and other financial service firms on compensation over the period 2013 to 2019. Specifically, I have been asked to independently analyze the competitiveness of compensation provided to Mr. Dondero compared to compensation received by executives and senior employees with similar experience and roles. In addition, I was asked to opine on and provide information on the use of loans in the marketplace as a form of compensation. Mr. Dondero is the Founder and, throughout the period, was the CEO, and head portfolio manager of Highland Capital Management LP ("HCM") and in that role, performed the same services for related companies and companies managed by HCM, including Highland Capital Management Financial Advisors ("HCMFA") and NexPoint Advisors ("NPA"). Market competitive compensation for Mr. Dondero during this period is relevant based on the apparent shortfall in annual compensation to Mr. Dondero. Throughout this period, he received loans in lieu of additional current compensation. Consistent with company practice, the loans were considered a form of deferred compensation that could be realized over time as the loans were forgiven and the income recognized by the individuals.

My opinions in this report are based on my experience consulting on executive compensation since 1980, my review of certain materials produced on Highland and its affiliates, and my perspectives on compensation programs for comparable senior executives and key employees in the industry.

STRICTLY CONFIDENTIAL

# BACKGROUND

**Professional Experience**

The issues I have been asked to provide opinions on are topics I have regularly encountered during many years of advising financial services firms, including asset management firms.  I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm.  My firm has specialized for many years in analyzing and advising the financial services industry, including major investment and asset management firms, hedge funds and other alternative investment firms, advisory firms, commercial banks, insurance companies, and brokerage firms.

I have extensive experience reviewing and assessing appropriate market levels of compensation for clients.  I have worked as a compensation consultant since 1980.  In 1992, I founded my own compensation consulting firm, Johnson Associates in New York City.  Johnson Associates, where I am currently Managing Director, is a boutique firm specializing in compensation consulting for the financial services industry.  We routinely consult on and have a strong understanding of market compensation levels for senior professionals and executives.  Prior to founding my own firm, I was a consultant at several leading compensation advisory firms.

Our clients have included many of the world's most significant financial institutions, asset managers and alternative investment firms across a broad range of issues.  A summary of my work history and education is attached as Exhibit A.  I am regularly quoted on compensation issues in major publications, including *The Wall Street Journal*, *Business Week*, *The New York Times*, *Fortune*, *The Washington Post*, *Bloomberg* and many others.

**App. 127**

STRICTLY CONFIDENTIAL

Over the past 20 years, I have provided expert testimony in more than 40 cases and have been qualified as an expert in the field of executive compensation 30+ times since founding my firm in 1992 (both on the employee and employer side).  A list of cases in which I have rendered expert testimony since 2016 is attached as Exhibit B.

## Compensation

I am being compensated at my normal hourly rate of $715 per hour for preparing this report.  My compensation is not contingent on the content of my opinions.  I have been assisted in this engagement by my associate, Michael Perniciaro.  Michael's normal hourly rate is $225 per hour. All opinions in this report are my own.

## Facts and Data Considered

In preparing this report, I considered certain documents provided to me, interviews with Mr. Dondero and former Highland or affiliate employees. The documents include information about Highland and its related entities, Mr. Dondero's compensation history, and financial statements over the period. Importantly, given the state of document production in this case, I did not receive all the documents typical for an assessment of compensation. The result of which could lead to a conservative bias in my assessment of market competitive compensation. I have evaluated publicly disclosed proxy statements of a select group of Highland peer firms, as well as information from news sources.  The information is consistent with the data and outcomes across our client studies.

**App. 128**

STRICTLY CONFIDENTIAL

## SUMMARY OF OPINIONS

Based on my experience as an executive compensation consultant and my review of the compensation and other documents, it is my opinion that:

- Reasonable compensation for Mr. Dondero's role is positioned well above the market median, toward the market high end. Based on analysis and market research, it is apparent that Mr. Dondero was the key leader of the firm and deeply involved in all its operations, with contributions well beyond the traditional CEO / Chief Investment Officer role at comparators. Competitive market high-end for Mr. Dondero's role is about $6.0M per year while his actual compensation over the period was an average of about $3.0M per year. Therefore, the aggregate shortfall in compensation provided to Mr. Dondero against reasonable compensation levels in the market is at least $21M over the period I examined. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder. Founders are often paid significantly more in the market.

- I understand from Mr. Dondero that the 2018 loans that are the subject of this suit were modified by an agreement in late 2018 or early 2019 under which the loans would be forgiven upon the sale at over cost of substantially all of any of three portfolio company assets held in the Highland platform, MGM, Cornerstone and/or Trussway. Based on interviews from prior employees, the use of forgivable loans was a known business practice at Highland and there was a clear expectation similar loans would be forgiven. Loans are often used both in private firms and more broadly in the market, both as a perk without forgiveness and also with forgiveness as deferred compensation.

6

**App. 129**

STRICTLY CONFIDENTIAL

- While I do not have sufficient data to know the capital in the firm at year end 2018,[1] the substantial amount of capital remaining in the firm at the time of bankruptcy (i.e., ≅ $399.6M) includes undistributed earnings to its Founders and primary shareholders, Mr. Dondero and Mr. Okada. For asset management firms, it is market practice to distribute most earnings annually to the firm's equity holders. The retention of the earnings in the business, further illustrate the shortfall in payments made to Mr. Dondero over the period.

---

[1] I have been told that the Debtor has not produced much of what was requested by Mr. Dondero and that Mr. Dondero no longer has access to the Highland server.  Therefore, I understand, what information he provided was from his own accountants, recollections, and/or from companies over which he still has control.

7

**App. 130**

STRICTLY CONFIDENTIAL

### STATEMENT OF OPINIONS

**<u>Factual Background</u>**

From my review and analysis of available materials and research, I understand the consolidated Highland business ("Highland") is a multi-strategy asset management firm focused on CLOs, hedge funds, and several private investments. Prior to the financial crisis, in 2008, Highland was very successful, reaching its peak revenue and assets under management levels. Looking at the post financial crisis period from 2013 to 2019, Highland continued to operate under the leadership of Mr. Dondero. During this period, several loans were made to Mr. Dondero. Part of my mandate was to assess market compensation levels during this period relative to firms with similar size and earnings. To do so, an assessment of Highland's financial information is necessary. I did not receive all of the financial information for HCM that I would have liked to have had because, I was told, HCM refused to produce most of the documentation requested from it. However, I was able to review the actual financials of HCMFA and NPA, and to obtain information Mr. Dondero possessed and/or recollected. The revenues for HCMFA and NPA ranged from $30.5M to $65.9M over the period with assets under management of $4.7B to $7.5B. To complete my analysis, Mr. Dondero provided his best recollection of the size and structure of the consolidated three entities stating assets under management from 2013 to 2019 ranging from $10.0B to $20.0B, with a primary focus on CLOs and an average of about $1.0B being in hedge funds. Based on the incomplete nature of my data review, there is a possibility that the market figures provided in this report could be understated based on my conservative approach, relying primarily on the documented data for HCMFA and NPA but only the recollection of Mr. Dondero for HCM, not the actual documentation, such as audited financial statements.

**App. 131**

STRICTLY CONFIDENTIAL

When examining Mr. Dondero's role at Highland relative to others in the market, it is apparent that his contributions and responsibilities exceeded the traditional duties of executive officers and lead investors who are paid significant amounts elsewhere. Mr. Dondero was the key man running daily business and operations, attracting clients, and overall investments. Given his outsized role, it would be reasonable to expect his compensation to be well above the market median. The sources utilized to ascertain specifics of his role and arrive at this conclusion include interviews with former Highland or Highland affiliate employees, as well as articles in the public domain and discussions with Mr. Dondero.

The total annual compensation for Mr. Dondero from 2013 - 2019 was $3.0M on average and the aggregate compensation over the period was $21.0M (source: W-2 filings). To assess the compensation in the market and determine the final market range, I utilized three methodologies including: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top portfolio managers. Market compensation figures provided in this report strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

To opine on the use of the loans as a form of compensation, I relied on market research, industry expertise, and interviews. My findings from this assessment are the use of forgivable loans was a normal business practice for Highland and there was a clear expectation they would be forgiven over time, based on varying performance criteria, depending on the employee.

An important additional consideration is the Founders, Mr. Dondero and Mr. Okada, did not receive the typical amount of distribution payments from their equity ownership. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital

**App. 132**

STRICTLY CONFIDENTIAL

in the business amounting to $399.6M. This amount includes undistributed earnings to the original equity shareholders, primarily Mr. Dondero.


**Market Assessment of Executive and Investor Compensation**

During my career as a compensation expert, I have had significant experience assessing and designing annual compensation awards across the financial services industry, including comparable asset management firms.  Accordingly, I am familiar with typical annual compensation levels for senior executives and senior portfolio managers at comparable asset management firms.  I would expect pay levels for a key individual such as Mr. Dondero to be substantial, given his contributions, responsibilities, and the competitive market for investment management pay.

To assess reasonable compensation across the competitive market range, it is important to determine Mr. Dondero's responsibilities and contributions relative to others in the industry. It is my understanding that Mr. Dondero worked tremendously long hours, was involved in all aspects of the business including investment decisions, fundraising, business management / administration and the operation of portfolio companies. An article published in the *Dallas Morning News* states, "Mr. Dondero works 70 hours weeks… his days are filled with board and investor meetings, company strategy sessions and constant monitoring and adjusting of the firm's portfolios."[2] In my opinion, Mr. Dondero's role as CEO and head portfolio manager clearly exceeds the traditional duties of executive officers who are paid significant amounts elsewhere. Based on his significant responsibilities and key man status for the firm, it would be reasonable to expect annual compensation significantly above the market median.

---

[2] "High Intensity Pays Off For Highland," The Dallas Morning News, September 3, 2003, https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

**App. 133**

STRICTLY CONFIDENTIAL

The appropriate positioning for Mr. Dondero is further accentuated by the assessment of "replacement cost". If Mr. Dondero departed Highland in the period of 2013 to 2019, the cost of replacing him as CEO / head investor with a similar level of contribution across all functions would be multiples of his annual compensation. In assessing and providing market compensation for Mr. Dondero's role, I considered how his skillsets and contributions are valued in the market. My assessment of market compensation considers the cost of replacing Mr. Dondero with an outside hire.

The final market range provided in Exhibit C reflects my industry experience and expertise as well as three methodologies for determining competitive compensation magnitudes. These methodologies include: (1) proxy analysis of CEOs at similarly sized, publicly traded asset management firms over the period, (2) market research on Portfolio Manager compensation, (3) top-down analysis of typical percent of revenue allocated to CEO and/or top Portfolio Managers. Several methodologies utilized to capture Mr. Dondero's specific role as CEO and head portfolio manager. The market figures do not include any premium for being a Founder. In the market, Founders can be, and generally are, paid substantially more.

As shown below and in Exhibit E, the average annual compensation of public company asset management CEOs from 2013 to 2019 ranges from $2.1M - $4.1M. Importantly, in the market it is common for some senior investment professionals to earn more than the CEO or other corporate officers. Incorporating firm leadership functions into the investment role is a savings of sorts, as someone must still do this job.

| Proxy Analysis CEO Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | $2,049 |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | $2,700 |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | $3,375 |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | $4,091 |

**App. 134**

STRICTLY CONFIDENTIAL

While we examined the disclosed compensation of a select group of public peers (Exhibit D), few of Highland's direct competitors are public and disclose the pay of their top investment professionals (see Exhibit F for some discussions about investment management compensation in the public domain).  Instead, firms are either 1) private, or 2) if public, disclosed officers most often are not highly paid portfolio management professionals.

Specifics of individual portfolio management pay are closely guarded for competitive reasons. That said, there are some articles quoting portfolio manager pay in the public domain showing compensation for portfolio managers can be well above the competitive range for public asset management CEOs (see Exhibit F). For example, according to an article published by "efinancialcareers" top performing portfolio managers at the average Hedge Funds with greater than $4.0B assets under management earned $6.8M in total compensation.[3] While Highland's structure differs from a pure hedge fund, the skills and role responsibilities are comparable to Mr. Dondero. Another example is the CEO of the Harvard Endowment, Mr. Narvekar, earned $6.25M in 2019.[4] The McLagan "Highland Capital CEO Compensation Analysis" (April 2020) produced by HCM, shows 2018 total compensation for the Head of Alternative Credit Strategy / CIO of $4.1M at the 75th percentile and 2018 total compensation for CEO With/Without CIO Responsibilities making $5.4M at the market median and $9.6M at the market 75th percentile.

The final method for assessing compensation in the market is a top-down analysis of competitive percentages of revenue attributed to portfolio managers or their teams in the market. Based on competitive market research and industry knowledge, 10% to 12% of revenue would

---

[3] Dan Butcher, "Here Are the Salaries and Bonuses at Hedge Funds in the U.S.," eFinancialCareers, May 5, 2018, https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

[4] Janet Lorin, "Harvard Endowment Chief Narvekar $6.25 Million for 2019," Bloomberg.com (Bloomberg, May 14, 2021), https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

**App. 135**

STRICTLY CONFIDENTIAL

be within the competitive market range for someone in Mr. Dondero's role. One public example of a dual CEO and CIO sharing directly in profitability is Mario Gabelli; he earns a fixed 10% of aggregate pre-tax profit every year per his employment agreement.[5]

The final competitive range below (Exhibit C) reflects the market competitive annual total compensation range. This competitive range was determined based on my interactions with asset management firms and over 30 years of industry experience and the insights gained from the three methodologies for determining competitive market compensation outlined above. Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder.

| Figures in 000s | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

Based on the market research and the insights gained through my extensive experience advising on compensation in the industry, reasonable annual compensation for Mr. Dondero's extensive role as CEO and portfolio manager is positioned at the market high-end at **$6.0M per year**. This figure takes into account firm size, profitability, asset class, and both the investment functions, as well as responsibilities for running the firm.  In summary, given his outsized role, his compensation should be positioned toward the market high-end.  If the comparison was directly to hedge fund portfolio managers, the figures would be far higher (i.e., often $10M+

---

[5] "Schedule 14A GAMCO INVESTORS, INC.," SEC.gov, April 29, 2020,
https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm

**App. 136**

STRICTLY CONFIDENTIAL

annually). Additionally, market figures do not include any premium for being a Founder. In the market, Founders are often paid substantially more than the market figures shown.

Mr. Dondero's aggregate compensation during the period of 2013 to 2019 is well below the reasonable market compensation level. Mr. Dondero's aggregate actual compensation from 2013 - 2019 was $21.0M (source: W-2 filings).  Reasonable competitive compensation for Mr. Dondero based on our analysis of his role is $6.0M per year or $42.0M in aggregate over the period. The shortfall in actual compensation to Mr. Dondero versus reasonably expected competitive compensation levels over the period is about **$21.0M** (Exhibit C). Market figures provided do not include any premium as a Founder, which further broadens the shortfall to market. An important additional consideration is the relative lack of typical equity distributions to Mr. Dondero for his historic ownership of the firm.

**<u>Use of Loans as Compensation</u>**

In my expert opinion, the use of loans from a company to its senior professionals continues to be a common practice for private businesses. At Highland, the use of loans was a common practice with the clear expectation among senior professionals that the loans would be forgiven over time based on performance, particularly of success in specified projects. I heard from former Highland or Highland affiliate employees that similar loans were used at Highland as deferred incentive compensation and intended to be forgiven over time or on the occurrence of particular achievements.

While, for public companies, Sarbanes Oxley Section 402 explicitly prohibits publicly traded companies from making loans to executive officers it is still a common practice at private

**App. 137**

STRICTLY CONFIDENTIAL

companies.[6] The use of these loans at private companies is beneficial for retention by allowing the firm to provide annual or periodic or other forgiveness for a portion the loan and eventually forgiving the full amount. The amount of loan forgiveness is considered income to the professionals and is taxable when forgiven. This was the case at Highland as well. In a publicly available article for the *Dow Jones Private Equity Analyst – Global Compensation Study*, two Proskauer partners outline the tax regulations for similar loans to professionals.[7]

### Market Practices on Equity Distributions

It is the standard practice in the market to distribute the majority of earnings to equity owners each year for asset management businesses. Based on the financials filed in connection with the bankruptcy, there was a significant amount of capital in the business equaling $399.6M. This amount included undistributed earnings to the primary equity holders, Mr. Dondero and Mr. Okada. Highland did not distribute these earnings based on their philosophy of "delayed gratification". This policy has been in place since the inception of the firm, including the peak years prior to the financial crisis. Very recently, the "delayed gratification" approach paid off in connection with Highland's private direct investment in MGM which was announced to be acquired by Amazon with significant economics attached.[8]

---

[6] Sarbanes-Oxley Act (2002).

[7] Michael J Album and James E Gregory, "Human Capital Considerations For Maturing Private Equity Firms," Dow Jones Private Equity Analyst-Global Compensation Study, 2012, pp. 84-96, https://www.proskauer.com/insights/download-pdf/1930.

[8] Annie Palmer, "Amazon to Buy MGM Studios for $8.45 Billion," CNBC (CNBC, May 26, 2021), https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 138**

STRICTLY CONFIDENTIAL

## CONCLUSION

It is my opinion that Mr. Dondero's aggregate compensation from 2013 to 2019 is significantly below the reasonable competitive compensation level for his role relative to similarly situated firms. In aggregate, the total shortfall in Mr. Dondero's actual compensation versus reasonable competitive compensation is at least $21.0M. This shortfall does not include any premium as a Founder, which could be considerable. Additionally, it is my opinion that the loans provided to Mr. Dondero should be considered potential deferred compensation as they were similar to loans given to other professionals at the firm. Lastly, the significant amount of capital in the business at the time of bankruptcy is at least partially attributable to Mr. Dondero as un-recognized payments as a prior equity holder, and indicates the rationale for having the potential for considerable deferred compensation.

\* \* \*

I reserve the right to supplement this report and/or to supplement or modify my opinions in light of any additional facts or data that may come to my attention.

Dated:  May 28, 2021

Respectfully submitted,

*Alan M. John*

Alan Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
Phone: (212) 221-740

16

**App. 139**

STRICTLY CONFIDENTIAL

**Exhibit A: Work History and Education**

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

**Professional Experience**

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 – 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 – 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 – 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 – 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 – 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 – Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

**Education**

| | |
|---|---|
| 1973 – 1975 | U.S. Naval Academy |
| 1975 – 1977 | University of Florida, B.A. (History/Economics) |
| 1977 – 1978 | University of Virginia, Graduate Economics |
| 1978 – 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**
- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms.  I consult on the design and magnitudes of compensation programs for senior executives on a regular basis.  I am quoted extensively in the press on compensation issues related to major financial service firms.

**App. 140**

STRICTLY CONFIDENTIAL

**Exhibit B: Alan M. Johnson Prior Expert Testimony for Previous Five Years**

| LAW FIRM: | CASE: | COURT: | |
|---|---|---|---|
| Schulte Roth & Zabel LLP | Mark Rohman and Sean Cunningham v. Capstone Advisory Group, LLC. | Arbitration | (April 2016) |
| Gibson Dunn & Crutcher LLP | United States v. Greebel | Eastern District of NY | (December 2017) |
| Cohen Tauber Spievack & Wagner P.C. | Jeffry Brown v. Neuberger Berman Group LLC, and NB Alternatives Advisers LLC | Arbitration | (January 2018) |
| Gibson Dunn & Crutcher LLP | Robert Emerson Mulholland v. UBS Financial Services Inc. | FINRA Dispute Resolution Arbitration | (December 2018) |
| Proskauer Rose LLP | Damian Dalla-Longa v. Magnetar Capital LLC | Arbitration | (September 2019) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Isaly v. OrbiMed | Arbitration | (January 2020) |
| Pachulski Stang Ziehl & Jones LLP | RTI Holding Company vs. Debtors | Delaware Bankruptcy Court | (December 2020) |

App. 141

STRICTLY CONFIDENTIAL

## Exhibit C: Actual Compensation vs. Estimated Market Compensation Range

### Mr. Dondero Actual Compensation (2013 - 2019)

**Notes:**  Mr. Dondero's compensation reflects amounts disclosed in W-2 filings for 2013 to 2019

- Does not include equity distributions over the period; typically, not included in competitive assessments of compensation.

| James Dondero Compensation | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Income | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total | Average |
| Highland Capital Management W-2 Income | $1,911,538 | $3,282,693 | $2,875,058 | $772,904 | $566,370 | $566,370 | $568,542 | $10,543,475 | $1,506,211 |
| Nexpoint Residential Trust W-2 Income | -- | -- | -- | -- | -- | $893,262 | -- | $893,262 | -- |
| NextPoint Advisors W-2 Income | -- | -- | -- | $1,628,736 | $3,118,250 | $2,870,278 | $1,953,455 | $9,570,718 | $2,392,679 |
| **Total W-2 Income (Source: W-2)** | **$1,911,538** | **$3,282,693** | **$2,875,058** | **$2,401,639** | **$3,684,620** | **$4,329,910** | **$2,521,996** | **$21,007,455** | **$3,001,065** |

### Estimated Market Compensation Range

**Notes:**  Market annual total compensation range reflecting my direct interactions with asset management firms and over 30 years of industry experience

- We have factored in Mr. Dondero's out-sized role / contributions on both the investment management and firm-stewardship responsibilities where applicable.
- Greater than findings from public proxy analysis reflecting higher compensation to portfolio managers in the market / alternatives space.
- Represents finding from the 3 methodologies outlined for determining market compensation.
- Market compensation figures strictly represent Mr. Dondero's managerial responsibilities and does not include any premium as a Founder

| Figures in 000s | 2013 - 2019 Total Annual Market Range | | |
|---|---|---|---|
| Market Match | Market Median | Market 75th Percentile | Market 90th Percentile / High-End |
| CEO / Portfolio Manager | $3,000 | $4,250 | **$6,000** |

### Compensation Shortfall

**Notes:**  In my opinion, reasonable competitive annual compensation for Mr. Dondero over the period is $6.0M, positioning him toward the market high-end to reflect his out-sized role and contribution to the firm

| | |
|---|---|
| Aggregate Reasonable Competitive Compensation | $42,000,000 |
| Less: Actual Total Compensation | $21,007,455 |
| **Shortfall in Compensation** | **$20,992,545** |

19

**App. 142**

STRICTLY CONFIDENTIAL

## Exhibit D: Select Public Peer Comparators

**Notes:**

- Industry consolidation continues to shrink pool of publicly available compensation data for the asset management industry, even at much larger firms than Highland
- Group intended to represent a range of firms that are relevant but not perfectly similar
- Disclosure of Portfolio Manager positions limited as typically not included in publicly filed data (no compulsion to disclose as with executive officers)
- Highland data includes good faith estimate of consolidated entities assets under management during the period. Actual financials not assessed due to the non-disclosure of Highland Capital Management ("HCM") information. Data for "HCMFA" and "NPA" reviewed.

| Peers | Assets Under Management ($B) | | | | | | | Revenue ($M) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
| **Asset Management** | | | | | | | | | | | | | | |
| Cohen & Steers | $72 | $55 | $62 | $60 | $53 | $53 | -- | $411 | $381 | $378 | $350 | $329 | $314 | $298 |
| Pzena Investment | $41 | $33 | $39 | $30 | $26 | $28 | $25 | $151 | $154 | $141 | $108 | $117 | $113 | $96 |
| Silvercrest | $25 | $19 | $21 | $19 | $18 | $18 | $16 | $102 | $99 | $91 | $80 | $75 | $69 | $60 |
| Diamond Hill | $23 | $19 | $22 | $19 | $17 | $16 | $12 | $137 | $146 | $145 | $136 | $124 | $105 | $81 |
| Manning & Napier | $19 | $20 | $25 | $32 | $35 | $48 | $51 | $136 | $161 | $202 | $249 | $328 | $405 | $376 |
| Westwood Holdings | $15 | $17 | $24 | $21 | $21 | $20 | $19 | $84 | $122 | $134 | $123 | $131 | $113 | $92 |
| Hennessy Advisors | $5 | $6 | $7 | $7 | $6 | $6 | $4 | $43 | $55 | $53 | $51 | $45 | $35 | $24 |
| Main Street Capital | $4 | $3 | $3 | -- | -- | -- | -- | $173 | $214 | $235 | -- | -- | -- | -- |
| **Consolidated Highland\*** | -- | $10.0 | $14.0 | $15.0 | $18.0 | $20.0 | $19.0 | -- | -- | -- | -- | -- | -- | -- |
| **Highland Hedge Fund\*** | | $1.9 | $1.0 | $0.9 | $1.3 | $1.0 | $0.7 | -- | -- | -- | -- | -- | -- | -- |
| **HCMFA & NP (only)** | $7.5 | $6.1 | $5.1 | $4.8 | $5.2 | $5.7 | $4.7 | $66 | $52 | $42 | $41 | $50 | $31 | $31 |

*Represents estimated for the consolidated three entities. Financial for Highland Capital Management ("HCM") not provided by the debtor

20

**App. 143**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

**Notes:**

- Reflects disclosed senior executive officer compensation in $ thousands
- CEO not necessarily the highest paid employee at any given firm
- Senior investment professionals' pay often not disclosed and can be greater than CEO
- GAMCO not included; Mr. Gabelli receives 10% of aggregate pre-tax profit annually
- Indicates awards granted for performance each, not outstanding or fully vested compensation
- Where applicable, partial year salaries annualized. One-time awards annualized over appropriate vesting periods. Performance share values reflects target award values; does not reflect payouts from past cycles

### Summary of Proxy Analysis

| Proxy Analysis CEO  Total Compensation (Asset Management) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Average |
| 25th Percentile | $1,515 | $1,680 | $2,405 | $1,845 | $2,370 | $2,310 | $2,220 | **$2,049** |
| Median | $2,600 | $2,490 | $2,600 | $2,080 | $3,380 | $3,080 | $2,670 | **$2,700** |
| 75th Percentile | $3,210 | $2,805 | $3,130 | $3,815 | $3,945 | $3,285 | $3,435 | **$3,375** |
| 90th Percentile | $4,510 | $3,760 | $3,840 | $4,690 | $4,125 | $3,720 | $3,990 | **$4,091** |

### Proxy Analysis by Year and Individual

| Chief Executive Officer - 2019 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $835 | **$1,585** | $0 | $2,915 | $0 | **$2,915** | $0 | **$4,500** |
| Manning & Napier | Mayer, M. | CEO | $500 | $2,250 | **$2,750** | $145 | $755 | $0 | **$900** | $0 | **$3,650** |
| Silvercrest | Hough, R. | Pres & CEO | $700 | $1,000 | **$1,700** | $800 | $475 | $0 | **$1,275** | $240 | **$3,215** |
| Main Street Capital | Hyzak, D. | CEO | $625 | $650 | **$1,275** | $0 | $1,395 | $0 | **$1,395** | $0 | **$2,670** |
| Pzena Investment | Pzena, R. | Chairman, CEO, & Co-CIO | $365 | $685 | **$1,055** | $0 | $1,425 | $0 | **$1,425** | $0 | **$2,480** |
| Hennessy Advisors | Hennessy, N. | Chairman & CEO | $350 | $1,455 | **$1,805** | $0 | $155 | $0 | **$155** | $0 | **$1,960** |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $0 | **$650** | $0 | $0 | $0 | **$0** | $0 | **$650** |
| 25th Percentile | | | $435 | $670 | $1,165 | $0 | $315 | $0 | $530 | $0 | $2,220 |
| 50th Percentile | | | $625 | $835 | $1,585 | $0 | $755 | $0 | $1,275 | $0 | $2,670 |
| 75th Percentile | | | $675 | $1,230 | $1,755 | $75 | $1,410 | $0 | $1,410 | $0 | $3,435 |
| 90th Percentile | | | $720 | $1,775 | $2,185 | $405 | $2,020 | $0 | $2,020 | $95 | $3,990 |

**App. 144**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

| Chief Executive Officer - 2018 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Cohen & Steers | Steers, R. | CEO | $750 | $650 | $1,400 | $0 | $2,355 | $0 | $2,355 | $0 | $3,755 |
| Westwood Holdings | Casey, B. | President & CEO | $650 | $1,065 | $1,715 | $0 | $0 | $1,995 | $1,995 | $0 | $3,710 |
| Pzena Investment | Pzena, R. | Chairman, CEO, & CIO | $365 | $995 | $1,360 | $0 | $1,925 | $0 | $1,925 | $0 | $3,285 |
| Main Street Capital | Hyzak, D. | CEO | $555 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,275 | $0 | $3,230 |
| Silvercrest | Hough, R. | CEO | $700 | $1,600 | $2,300 | $500 | $40 | $0 | $540 | $240 | $3,080 |
| Hennessy Advisors | Hennessy, N. | CEO | $350 | $2,420 | $2,770 | $0 | $220 | $0 | $220 | $0 | $2,990 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $500 | $800 | $0 | $1,000 | $0 | $1,000 | $510 | $2,310 |
| Manning & Napier | Coons, J. | Co-CEO & President | $400 | $520 | $920 | $0 | $0 | $0 | $0 | $0 | $920 |
| Manning & Napier | Goldberg, R. | Co-CEO & Director | $750 | $0 | $750 | $0 | $155 | $0 | $155 | $0 | $905 |
| 25th Percentile | | | $365 | $520 | $920 | $0 | $40 | $0 | $220 | $0 | $2,310 |
| 50th Percentile | | | $555 | $995 | $1,400 | $0 | $220 | $0 | $1,000 | $0 | $3,080 |
| 75th Percentile | | | $700 | $1,400 | $1,955 | $0 | $1,275 | $0 | $1,925 | $0 | $3,285 |
| 90th Percentile | | | $750 | $1,765 | $2,395 | $100 | $2,010 | $400 | $2,065 | $295 | $3,720 |

| Chief Executive Officer - 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Westwood Holdings | Casey, B. | CEO | $650 | $1,540 | $2,190 | $0 | $0 | $1,995 | $1,995 | $0 | $4,185 |
| Cohen & Steers | Steers, R. | CEO | $750 | $735 | $1,485 | $0 | $2,615 | $0 | $2,615 | $0 | $4,100 |
| Main Street Capital | Foster, V. | Chairman, CEO | $610 | $1,500 | $2,110 | $0 | $1,780 | $0 | $1,780 | $0 | $3,890 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,240 | $3,590 | $0 | $245 | $0 | $245 | $0 | $3,835 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $2,560 | $2,925 | $0 | $0 | $0 | $0 | $0 | $2,925 |
| Silvercrest | Hough, R. | CEO | $700 | $1,500 | $2,200 | $0 | $40 | $0 | $40 | $240 | $2,480 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $550 | $850 | $0 | $0 | $0 | $0 | $1,180 | $2,030 |
| Manning & Napier | Stamey, C. | Co-CEO, Sales / Distribution | $300 | $1,140 | $1,440 | $0 | $135 | $0 | $135 | $0 | $1,575 |
| 25th Percentile | | | $340 | $1,040 | $1,475 | $0 | $0 | $0 | $30 | $0 | $2,370 |
| 50th Percentile | | | $490 | $1,500 | $2,150 | $0 | $90 | $0 | $190 | $0 | $3,380 |
| 75th Percentile | | | $665 | $1,795 | $2,380 | $0 | $630 | $0 | $1,835 | $60 | $3,945 |
| 90th Percentile | | | $715 | $2,765 | $3,125 | $0 | $2,030 | $600 | $2,180 | $520 | $4,125 |

| Chief Executive Officer - 2016 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
| Westwood Holdings | Casey, B. | CEO | $650 | $1,350 | $2,000 | $0 | $0 | $3,955 | $3,955 | $0 | $5,955 |
| Cohen & Steers | Steers, R. | CEO | $750 | $675 | $1,425 | $0 | $2,425 | $0 | $2,425 | $0 | $3,850 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $3,075 | $3,425 | $0 | $350 | $0 | $350 | $0 | $3,775 |
| Diamond Hill | Bingaman, C. | President & CEO | $300 | $600 | $900 | $0 | $0 | $0 | $0 | $1,180 | $2,080 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $365 | $1,600 | $1,965 | $0 | $0 | $0 | $0 | $0 | $1,965 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $55 | $0 | $55 | $240 | $1,720 |
| Manning & Napier | Manning, W. | CEO | $1,400 | $0 | $1,400 | $0 | $0 | $0 | $0 | $0 | $1,400 |
| 25th Percentile | | | $360 | $640 | $1,415 | $0 | $0 | $0 | $0 | $0 | $1,845 |
| 50th Percentile | | | $650 | $725 | $1,425 | $0 | $0 | $0 | $55 | $0 | $2,080 |
| 75th Percentile | | | $725 | $1,475 | $1,985 | $0 | $205 | $0 | $1,390 | $120 | $3,815 |
| 90th Percentile | | | $1,010 | $2,190 | $2,570 | $0 | $1,180 | $1,580 | $3,035 | $615 | $4,690 |

**App. 145**

STRICTLY CONFIDENTIAL

## Exhibit E: Proxy Analysis Disclosed Public Peer CEO Compensation (2013 - 2019)

### Chief Executive Officer - 2015

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $2,065 | $2,665 | $0 | $0 | $2,090 | $2,090 | $0 | $4,755 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $2,515 | $2,865 | $0 | $370 | $0 | $370 | $0 | $3,230 |
| Cohen & Steers | Steers, R. | CEO | $750 | $485 | $1,235 | $0 | $1,790 | $0 | $1,790 | $0 | $3,025 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $0 | $500 | $0 | $0 | $2,000 | $2,000 | $0 | $2,500 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $380 | $605 | $980 | $0 | $0 | $1,330 | $1,330 | $0 | $2,310 |
| Silvercrest | Hough, R. | CEO | $700 | $725 | $1,425 | $0 | $240 | $0 | $240 | $0 | $1,665 |
| 25th Percentile | | | $370 | $545 | $990 | $0 | $0 | $0 | $850 | $0 | $2,405 |
| 50th Percentile | | | $500 | $640 | $1,235 | $0 | $0 | $1,330 | $1,600 | $0 | $2,600 |
| 75th Percentile | | | $650 | $1,395 | $2,045 | $0 | $305 | $1,800 | $1,895 | $0 | $3,130 |
| 90th Percentile | | | $720 | $2,245 | $2,745 | $0 | $940 | $2,035 | $2,035 | $0 | $3,840 |

### Chief Executive Officer - 2014

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,995 | $2,595 | $0 | $0 | $2,060 | $2,060 | $0 | $4,650 |
| Cohen & Steers | Steers, R. | CEO | $750 | $460 | $1,210 | $0 | $1,660 | $0 | $1,660 | $0 | $2,870 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,750 | $2,100 | $0 | $280 | $0 | $280 | $0 | $2,380 |
| Silvercrest | Hough, R. | CEO | $650 | $725 | $1,375 | $0 | $70 | $0 | $70 | $0 | $1,445 |
| Manning & Napier | Cunningham, P. | CEO | $500 | $495 | $995 | $0 | $0 | $0 | $0 | $0 | $995 |
| 25th Percentile | | | $395 | $530 | $1,055 | $0 | $0 | $0 | $125 | $0 | $1,680 |
| 50th Percentile | | | $550 | $685 | $1,295 | $0 | $35 | $0 | $940 | $0 | $2,490 |
| 75th Percentile | | | $640 | $1,495 | $1,920 | $0 | $230 | $1,200 | $1,645 | $0 | $2,805 |
| 90th Percentile | | | $700 | $1,875 | $2,350 | $0 | $970 | $1,830 | $1,860 | $0 | $3,760 |

### Chief Executive Officer - 2013

| Company | Executive | Position | Base Salary | Cash Bonus | Total Cash | Stock Options | Restricted Shares | Perf Shares | Total Long Term | One-Time (Annualized) | Total Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Manning & Napier | Cunningham, P. | CEO | $500 | $1,500 | $2,000 | $0 | $4,020 | $0 | $4,020 | $0 | $6,020 |
| Westwood Holdings | Casey, B. | President, CEO | $600 | $1,505 | $2,105 | $0 | $0 | $1,395 | $1,395 | $0 | $3,500 |
| Cohen & Steers | Steers, R. | CEO | $750 | $365 | $1,115 | $0 | $1,800 | $0 | $1,800 | $0 | $2,915 |
| Diamond Hill | Dillon, R. | CEO | $360 | $640 | $1,000 | $0 | $0 | $1,600 | $1,600 | $0 | $2,600 |
| Hennessy Advisors | Hennessy, N. | President & CEO | $350 | $1,170 | $1,520 | $0 | $90 | $0 | $90 | $0 | $1,610 |
| Pzena Investment | Pzena, R. | CEO, Co-CIO | $280 | $1,145 | $1,420 | $0 | $0 | $0 | $0 | $0 | $1,420 |
| Silvercrest | Hough, R. | CEO | $500 | $600 | $1,100 | $0 | $70 | $0 | $70 | $0 | $1,170 |
| 25th Percentile | | | $355 | $620 | $1,110 | $0 | $0 | $0 | $80 | $0 | $1,515 |
| 50th Percentile | | | $500 | $1,145 | $1,420 | $0 | $70 | $0 | $1,395 | $0 | $2,600 |
| 75th Percentile | | | $550 | $1,335 | $1,760 | $0 | $945 | $700 | $1,700 | $0 | $3,210 |
| 90th Percentile | | | $660 | $1,500 | $2,040 | $0 | $2,690 | $1,475 | $2,690 | $0 | $4,510 |

App. 146

STRICTLY CONFIDENTIAL

**Exhibit F: Discussions of Investment Management Compensation in the Public Domain**

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

"Eight Hedge Fund Managers Earned More Than $1 Billion Each in 2019. Cue the Questions." *Institutional Investo*r.  March 25, 2020. https://www.institutionalinvestor.com/article/b1kwjngp2rnp9y/Eight-Hedge-Fund-Managers-Earned-More-Than-1-Billion-Each-in-2019-Cue-the-Questions

Langlois, Shawn. "Think celebrities and CEOs make way too much money? Check out this chart" *MarketWatch.com*. November 29, 2019. https://www.marketwatch.com/story/hedge-fund-managers-to-taylor-swift-and-disneys-bob-iger-hold-my-beer-2019-11-26

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

Moore, Heidi.  "Bill Gross reportedly earns $290m bonus even as investors withdraw billions from Pimco funds" *The Guardian.*  November 14, 2014. https://www.theguardian.com/business/2014/nov/14/pimco-paid-15bn-bonus-pool-executives-according-to-disputed-report

Rosenburg, John S.  "Harvard Discloses Leaders' Annual Compensation" *Harvard Magazine*. May 11, 2018 https://www.harvardmagazine.com/2018/05/harvard-endowment-manager-and-administrator-pay

STRICTLY CONFIDENTIAL

## Documents Reviewed

### Data Items Reviewed from Debtor
- Bates Label Range: D-JDNL-017439 to D-JDNL-017441

### Data Items Reviewed:
- Bates Label Range: EXPERT 0000001 to EXPERT 0002316

### Individual Documents - Starting Bates Label

- Expert 1 – EXPERT 0000001
- Expert 1 – EXPERT 0000003
- Expert 1 – EXPERT 0000004
- Expert 1 – EXPERT 0000024
- Expert 1 – EXPERT 0000026
- Expert 1 – EXPERT 0000028
- Expert 1 – EXPERT 0000030
- Expert 1 – EXPERT 0000365
- Expert 1 – EXPERT 0000367
- Expert 1 – EXPERT 0000372
- Expert 1 – EXPERT 0000383
- Expert 1 – EXPERT 0000384
- Expert 1 – EXPERT 0000385
- Expert 1 – EXPERT 0000387
- Expert 1 – EXPERT 0000389
- Expert 1 – EXPERT 0000679
- Expert 1 – EXPERT 0000703
- Expert 1 – EXPERT 0000928
- Expert 1 – EXPERT 0000929
- Expert 1 – EXPERT 0000931
- Expert 1 – EXPERT 0000933
- Expert 1 – EXPERT 0000935
- Expert 1 – EXPERT 0000937
- Expert 1 – EXPERT 0000940
- Expert 1 – EXPERT 0000942
- Expert 1 – EXPERT 0000944
- Expert 1 – EXPERT 0000968
- Expert 1 – EXPERT 0000970
- Expert 1 – EXPERT 0000972
- Expert 1 – EXPERT 0000974
- Expert 1 – EXPERT 0000979
- Expert 1 – EXPERT 0001003
- Expert 1 – EXPERT 0001021
- Expert 1 – EXPERT 0001023
- Expert 1 – EXPERT 0001324
- Expert 1 – EXPERT 0001578
- Expert 1 – EXPERT 0001579
- Expert 1 – EXPERT 0001580
- Expert 1 – EXPERT 0001581
- Expert 1 – EXPERT 0001881
- Expert 1 – EXPERT 0001897
- Expert 1 – EXPERT 0001898
- Expert 1 – EXPERT 0001900
- Expert 1 – EXPERT 0001902
- Expert 1 – EXPERT 0001903
- Expert 1 – EXPERT 0001905
- Expert 1 – EXPERT 0001928
- Expert 1 – EXPERT 0001935
- Expert 1 – EXPERT 0001957
- Expert 1 – EXPERT 0001975
- Expert 1 – EXPERT 0001998
- Expert 1 – EXPERT 0002233
- Expert 1 – EXPERT 0002234
- Expert 1 – EXPERT 0002253
- Expert 1 – EXPERT 0002260
- Expert 1 – EXPERT 0002267
- Expert 1 – EXPERT 0002285
- Expert 1 – EXPERT 0002304

App. 148

STRICTLY CONFIDENTIAL

**Bibliography**

"High Intensity Pays Off For Highland." *The Dallas Morning News*, September 3, 2003. https://www.pressreader.com/usa/the-dallas-morning-news/20060903/283218733648003.

Butcher, Dan. "Here Are the Salaries and Bonuses at Hedge Funds in the U.S." eFinancialCareers, May 5, 2018. https://www.efinancialcareers.com/news/finance/the-salaries-and-bonuses-of-investment-professionals-at-large-hedge-fund-compensation.

Lorin, Janet. "Harvard Endowment Chief Narvekar $6.25 Million for 2019." Bloomberg.com. Bloomberg, May 14, 2021. https://www.bloomberg.com/news/articles/2021-05-14/harvard-paid-endowment-chief-narvekar-6-25-million-for-2019.

"Schedule 14A GAMCO INVESTORS, INC." SEC.gov, April 29, 2020. https://www.sec.gov/Archives/edgar/data/0001060349/000106034920000009/gblproxyfinal2020.htm.

Sarbanes-Oxley Act (2002). https://www.friedfrank.com/siteFiles/Publications/681A0950DF7BC8CF412DF4C4A4805E09.pdf.

Album, Michael J, and James E Gregory. "Human Capital Considerations For Maturing Private Equity Firms."  Dow Jones Private Equity Analyst-Global Compensation Study, 2012. https://www.proskauer.com/insights/download-pdf/1930.

Palmer, Annie. "Amazon to Buy MGM Studios for $8.45 Billion." CNBC. CNBC, May 26, 2021. https://www.cnbc.com/2021/05/26/amazon-to-buy-mgm-studios-for-8point45-billion.html.

**App. 149**